# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Hicham Aboutaam,<br><br>  *Plaintiff*,<br><br>  v.<br><br>L'Office Fédéral de la Culture de la Confédération Suisse, L'Administration Fédérale Des Douanes de la Confédération Suisse, La République et Canton de Genève,<br><br>  *Defendants*. | Case No. 18-cv-08248<br>The Honorable Ronnie Abrams |
| Lynda Beierwaltes, William Beierwaltes,<br><br>  *Plaintiffs*,<br><br>  v.<br><br>L'Office Fédéral de la Culture de la Confédération Suisse, L'Administration Fédérale Des Douanes de la Confédération Suisse, La République et Canton de Genève,<br><br>  *Defendants*. | Related Case No. 18-cv-11167<br>The Honorable Ronnie Abrams |

# THE REPUBLIC AND CANTON OF GENEVA'S
# MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS

Robert Reeves Anderson (*pro hac vice*)
ARNOLD & PORTER KAYE SCHOLER LLP
370 Seventeenth Street, Suite 4400
Denver, CO 80202-1370
(303) 863-1000
Reeves.Anderson@arnoldporter.com

Marcus A. Asner
Mathieu Coquelet Ruiz (*pro hac vice*)
ARNOLD & PORTER KAYE SCHOLER LLP
250 W. 55th Street
New York, NY 10019-9710
(212) 836-7222
Marcus.Asner@arnoldporter.com
Mathieu.Ruiz@arnoldporter.com

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION .............................................................................................................1

RELEVANT BACKGROUND ..........................................................................................2

    A.  The Parties .........................................................................................................2

    B.  Legal Framework Governing Trade in Cultural Property ............................................3

    C.  Swiss Proceedings ..................................................................................................5

STANDARD OF REVIEW ................................................................................................9

ARGUMENT ...................................................................................................................10

I.    Geneva Is Immune From Suit Under the FSIA ...................................................10

    A.  Plaintiffs' Property Was Not "Taken" ..............................................................11

    B.  Plaintiffs' Property Was Not Taken "In Violation Of International Law" ................14

    C.  Plaintiffs' Claims Against Geneva Do Not Have the Requisite Nexus with the United States .......................................................................................................17

II.   The Act of State Doctrine Bars Plaintiffs' Claims ...........................................20

III.  Comity Warrants Dismissal In Favor of Swiss Proceedings ...............................24

CONCLUSION ...............................................................................................................26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re 650 Fifth Ave. & Related Props.*,
  777 F. Supp. 2d 529 (S.D.N.Y. 2011) ................................................................. 13

*800537 Ontario, Inc. v. World Imports U.S.A., Inc.*,
  145 F. Supp. 2d 288 (W.D.N.Y. 2001) ................................................................ 24

*Abelesz v. Magyar Nemzeti Bank*,
  692 F.3d 661 (7th Cir. 2012) ............................................................................... 25

*Acadia Tech., Inc. v. United States*,
  458 F.3d 1327 (Fed. Cir. 2006) ........................................................................... 13

*AmeriSource Corp. v. United States*,
  525 F.3d 1149 (Fed. Cir. 2008) ........................................................................... 13

*Ancient Coin Collectors Guild v. U.S. Customs & Border Protection*,
  698 F.3d 171 (4th Cir. 2012) ............................................................................... 16

*Argentine Republic v. Amerada Hess Shipping Corp.*,
  488 U.S. 428 (1989) .............................................................................................. 9

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ....................................................................................... 10, 20

*Autocephalous Greek-Orthodox Church of Cyprus v. Goldberg & Feldman Fine
  Arts, Inc.*,
  917 F.2d 278 (7th Cir. 1990) ............................................................................... 16

*Best Med. Belgium, Inc. v. Kingdom of Belgium*,
  913 F. Supp. 2d 230 (E.D. Va. 2012) .................................................................. 15

*Big Sky Network Canada, Ltd. v. Sichuan Provincial Government*,
  533 F.3d 1183 (10th Cir. 2008) ........................................................................... 19

*Chettri v. Nepal Rastra Bank*,
  834 F.3d 50 (2d Cir. 2016) ............................................................... 10, 12, 13, 14

*Credit Suisse v. U.S. District Court for the Central District of California*,
  130 F.3d 1342 (9th Cir. 1997) ................................................................. 21, 22, 23

*de Csepel v. Republic of Hungary*,
  859 F.3d 1094 (D.C. Cir. 2017), *cert. denied*, 2019 WL 113526 (Jan. 7, 2019) .................... 18

*Dickson Marine Inc. v. Panalpina, Inc.*,
   179 F.3d 331 (5th Cir. 1999) ........................................................................25

*Empresa Cubana Exportadora, Inc. v. Lamborn & Co.*,
   652 F.2d 231 (2d Cir. 1981) .........................................................................22

*Fischer v. Magyar Allamvasutak Zrt.*,
   777 F.3d 847 (7th Cir. 2015) ...................................................................24, 25

*Freund v. Republic of France*,
   592 F. Supp. 2d 540 (S.D.N.Y. 2008), *aff'd*, 391 F. App'x 939 (2d Cir. 2010)....................25

*FTE v. Spirits Int'l B.V.*,
   809 F.3d 737 (2d Cir. 2016) .............................................................20, 24, 25

*Garb v. Republic of Poland*,
   440 F.3d 579 (2d Cir. 2006) .............................................................11, 18, 19

*Garcia v. Chase Manhattan Bank, N.A.*,
   735 F.2d 645 (2d Cir. 1984) .........................................................................22

*Greenpeace, Inc. (U.S.A.) v. State of France*,
   946 F. Supp. 773 (C.D. Cal. 1996).................................................................16

*Hilsenrath v. Swiss Confederation*,
   No. 07-cv-2782, 2007 WL 3119833 (N.D. Cal. Oct. 23, 2007) ...................14, 15

*Hilsenrath v. Swiss Confederation*,
   402 F. App'x 314 (9th Cir. 2010) ..................................................................15

*Hilton v. Guyot*,
   159 U.S. 113 (1895) ......................................................................................25

*Hulton v. Bayerische Staatsgemaldesammlungen*,
   --- F. Supp. 3d ---, 2018 WL 4757949 (S.D.N.Y. Sept. 28, 2018) .................10, 11

*Kashef v. BNP Paribas SA*,
   316 F. Supp. 3d 770 (S.D.N.Y. 2018) ............................................................10

*Leopard Marine & Trad., Ltd. v. Easy Street Ltd.*,
   896 F.3d 174 (2d Cir. 2018) .........................................................................24

*McKesson Corp. v. Islamic Republic of Iran*,
   672 F.3d 1066 (D.C. Cir. 2012) ....................................................................10

*Moore v. Mitchell*,
   30 F.2d 600 (2d Cir. 1929) ...........................................................................25

*Nicosia v. Amazon.com, Inc.*,
  834 F.3d 220 (2d Cir. 2016) ......................................................................5, 10

*Nkana v. Federal Republic of Nigeria*,
  238 F. Supp. 3d 17 (D.D.C. 2017) ...................................................................23

*Nocula v. UGS Corp.*,
  520 F.3d 719 (7th Cir. 2008) .....................................................................22, 23

*Official Stanford Invs. Comm. v. Bank of Antigua*,
  No. 13-cv-762, 2018 WL 3956470 (N.D. Tex. Aug. 17, 2018) ...........................15

*Oui Fin. LLC v. Dellar*,
  No. 12-cv-7744, 2013 WL 5568732 (S.D.N.Y. Oct. 9, 2013).......................... 10, 24

*Pablo Star, Ltd. v. Welsh Government*,
  170 F. Supp. 3d 597 (S.D.N.Y. 2016) ...............................................................19

*PT United Can Co. v. Crown Cork & Seal Co.*,
  138 F.3d 65 (2d Cir. 1998) ...............................................................................25

*Rong v. Liaoning Provincial Government*,
  452 F.3d 883 (D.C. Cir. 2006) .........................................................................19

*Saudi Arabia v. Nelson*,
  507 U.S. 349 (1993) ..........................................................................................9

*Schoeps v. Freistaat Bayern*,
  611 F. App'x 32 (2d Cir. 2015) ........................................................................19

*State Farm Mut. Auto. Ins. Co. v. Ins. Co. of British Columbia*,
  No. 09-cv-762, 2010 WL 331786 (D. Ore. Jan. 25, 2010)...................................19

*United States v. Eighteenth Century Peruvian Oil on Canvas*,
  597 F. Supp. 2d 618 (E.D. Va. 2009) ..................................................................4

*United States v. Mask of Ka-Nefer-Nefer*,
  752 F.3d 737 (8th Cir. 2014) .............................................................................4

*United States v. Schultz*,
  333 F.3d 393 (2d Cir. 2003) ..............................................................................5

*W.S. Kirkpatrick & Co. v. Envt'l Tectonics Corp., Int'l*,
  493 U.S. 400 (1990) ........................................................................................21

*Wasserstein Perella Emerging Mkts. Fin., L.P. v. Province of Formosa*,
  No. 97-cv-793, 2002 WL 1453831 (S.D.N.Y. July 2, 2002)................................19

*Xi Wei Lin v. Chinese Staff & Workers Ass'n*,
    No. 11-cv-3944, 2012 WL 5457493 (S.D.N.Y. Nov. 8, 2012) ................................................5

*Yavuz v. 61 MM, Ltd.*,
    576 F.3d 1166 (10th Cir. 2009)..........................................................................................25

*Zapolski v. Fed. Rep. of Germany*,
    No. 09-cv-1503, 2010 WL 1816327 (E.D.N.Y. May 4, 2010)..............................................16

*Zappia Middle E. Constr. Co. Ltd. v. Emirate of Abu Dhabi*,
    215 F.3d 247 (2d Cir. 2000) ......................................................................................12, 20

## Statutes

19 U.S.C. §§ 2602–13 ...............................................................................................................4

28 U.S.C. § 1330.......................................................................................................................9

28 U.S.C. §§ 1602–11 ...............................................................................................................9

28 U.S.C. § 1603(a) ...........................................................................................................10, 17

28 U.S.C. § 1604.....................................................................................................................10

28 U.S.C. § 1605(a)(3) .................................................................................................14, 17, 20

## Rules

Fed. R. Civ. P. 12(b)(1)...........................................................................................................10

Fed. R. Civ. P. 12(b)(6)...........................................................................................................10

## Other Authorities

Br. for United States as Amicus Curiae at 11, *de Csepel v. Republic of Hungary*
    (17-1165) (U.S. Dec. 4, 2018) ..............................................................................................18

Constitution de la République et Canton de Genève (Oct. 14, 2012),
    https://www.ge.ch/constitution/doc/nouvelle-constitution.pdf.................................................3

Federal Act of the International Transfer of Cultural Property,
    https://tinyurl.com/yc2dsavr .............................................................................................4, 17

Federal Constitution of the Swiss Confederation (Apr. 18, 1999),
    https://www.admin.ch/opc/en/classified-compilation/19995395/index.html...........................3

Federal Office of Culture, *Rules for the Art Trade* (July 4, 2013),
    https://tinyurl.com/yc9t8bmw..............................................................................................3

H.R. Rep. 94-1487 (1976) ......................................................................................... 18, 19

Pub. L. 97-446 (1983) ...................................................................................................... 4

Restatement (Fourth) of Foreign Relations Law § 452 ................................................ 19

Restatement (Second) of Foreign Relations Law § 192 ............................................... 16

Restatement (Third) of Foreign Relations Law § 452 ................................................. 19

Swiss Criminal Procedure Code Article 241 ............................................................... 14

Swiss Criminal Procedure Code Article 263 ............................................................... 14

UNESCO Convention on the Means of Prohibiting and Preventing the Illicit
    Import, Export and Transfer of Ownership of Cultural Property. 823 U.N.T.S.
    231 (1972) ................................................................................................... 3, 4, 16

## INTRODUCTION

These lawsuits seek to usurp and invalidate an ongoing criminal investigation in Switzerland that is being conducted by Swiss authorities, is governed by Swiss law, and relates to property seized and located exclusively in Switzerland. This dispute cannot and should not be heard in the United States.

In December 2016, a Swiss border agent stopped and inspected a vehicle registered to a company owned by Plaintiff Hicham Aboutaam's brother. The agent found a fraudulently imported antique oil lamp and receipts for a storage warehouse in Geneva. Immediately following the interception of the vehicle, surveillance footage at the warehouse captured the movement of merchandise in the early morning, prompting suspicion that other fraudulently imported archeological property was being kept on the premises.

The Swiss Federal Customs Administration filed two complaints in January and February 2017 relating to articles of cultural property that had suspicious origin. The Republic and Canton of Geneva's Public Prosecutor's Office issued Search and Seizure Orders that were carried out with Swiss Federal Customs Administration agents. Plaintiffs complain that the Swiss authorities seized art and antiques from warehouses and other locations in Geneva—property in which Plaintiffs claim an ownership interest. These allegedly included objects that had been consigned by the Beierwaltes Plaintiffs to the Aboutaams. The seized artifacts are required to remain in Geneva during the investigation or until released by Swiss authorities.

Plaintiffs never appealed or challenged the decisions of the Swiss prosecutor in Swiss courts, though they were advised of their right to do so. Rather than pursue available redress in Switzerland, Plaintiffs decided to sue in the United States three sovereign divisions of the Government of Switzerland. Invoking an argument that other courts have rejected as "frivolous" and that is foreclosed by binding Second Circuit precedent, Plaintiffs attempt to circumvent

defendants' immunity and to disregard the respect and deference U.S. courts give to sovereign acts taken by an allied government within its own borders. If Plaintiffs believe that the disputed antiquities are rightfully theirs and are prepared to defend their legality, they can be heard in Swiss courts. For the reasons set forth below, this Court should dismiss these cases.

## RELEVANT BACKGROUND[1]

### A.    The Parties

Plaintiff Hicham Aboutaam claims to be a dealer of antiquities and, along with his brother Ali Aboutaam, co-founder of Phoenix Ancient Art S.A., a gallery in Geneva. *Aboutaam* Compl. ("AC") ¶ 2. Hicham manages an affiliated gallery in New York, Electrum, which is the exclusive agent of Phoenix, while Ali manages Phoenix's gallery in Geneva. *Id.* The Aboutaam brothers claim to have inherited a collection of ancient art from their father and have bought and sold antiquities in the international market. *Id.* ¶ 29. Hicham alleges that Phoenix and Electrum purchase objects in reliance on express and implied warranties from sellers and an absence of reported thefts, and that they "are careful to avoid material that is likely to have been freshly looted, illegally excavated or stolen." *Id.* ¶ 30.

Plaintiffs Lynda and William Beierwaltes are art collectors. *Beierwaltes* Compl. ("BC") ¶ 1. In the early 2000s, the Beierwaltes decided to liquidate their antiquities assets to pay off creditors. They entered into a contract with Phoenix, granting it the exclusive right to sell their antiquities collection. *Id.* ¶¶ 29, 30. In 2013, the Beierwaltes filed for bankruptcy, and the bankruptcy court appointed Phoenix as the estate's designated antiquities dealer to sell their collection. *Id.* ¶ 32. The bankruptcy proceeding settled, the bankruptcy petition was dismissed, and the liens of the secured creditors were satisfied. *Id.* ¶ 33. The Beierwaltes still owe a judgment creditor several million dollars. *Id.* ¶ 34.

---

[1] For purposes of this motion only, well-pleaded factual allegations in the Complaints are assumed to be true.

The République et Canton de Genève ("Geneva" or "Canton of Geneva") is a political subdivision of the Government of Switzerland. The Swiss structure of government is similar to that of the United States: the Swiss Confederation is a federal nation, which allocates its powers between the federal government, the cantons (which are also called states), and localities.[2] The Canton of Geneva is a democratic State and sovereign canton of the Swiss Confederation.[3] The Canton of Geneva has its own parliament, government, courts, and constitution.[4]

**B.    Legal Framework Governing Trade in Cultural Property**

The United States and Switzerland are parties to the UNESCO Convention on the Means of Prohibiting and Preventing the Illicit Import, Export and Transfer of Ownership of Cultural Property. 823 U.N.T.S. 231 (1972); AC ¶ 26; BC ¶ 25. The Convention establishes "minimum requirements for legislative, administrative, treaty-related measures, which states parties are required to undertake to prevent the illegal trade in cultural property."[5] The Convention was founded upon recognition that "the illicit import, export and transfer of ownership of cultural property is an obstacle" to "universally recognized moral principles" of cultural heritage. Convention, pmbl. The UNESCO Convention so prioritizes the return of cultural property to its country of origin that even in the case of "an innocent purchaser" or of a purchaser with "valid title to that property," the property still is subject to seizure, recovery, and return, so long as the

---

[2] *See* Federal Constitution of the Swiss Confederation (Apr. 18, 1999) ("Swiss Constitution"), art. 1 ("The People and the Cantons of Zurich, Bern, Lucerne, Uri, Schwyz, Obwalden and Nidwalden, Glarus, Zug, Fribourg, Solothurn, Basel Stadt and Basel Landschaft, Schaffhausen, Appenzell Ausserrhoden and Appenzell Innerrhoden, St. Gallen, Graubünden, Aargau, Thurgau, Ticino, Vaud, Valais, Neuchâtel, Geneva, and Jura form the Swiss Confederation."); *see also id.* Title III, Ch. 1 ("Relations between the Confederation and the Cantons"), https://www.admin.ch/opc/en/classified-compilation/19995395/index.html.

[3] *See* Swiss Constitution, art. 3 ("The Cantons are sovereign except to the extent that their sovereignty is limited by the Federal Constitution. They exercise all rights that are not vested in the Confederation."); Constitution de la République et Canton de Genève (Oct. 14, 2012) ("Geneva Constitution"), art. 1 ("The Republic of Geneva is a democratic State….") (translation from French), https://www.ge.ch/constitution/doc/nouvelle-constitution.pdf.

[4] *See* Geneva Constitution, Title IV (Authorities).

[5] Federal Office of Culture, *Rules for the Art Trade* (July 4, 2013), https://tinyurl.com/yc9t8bmw.

requesting country pays just compensation. Convention, art. 7(b)(ii). Other civil and criminal remedies are available as a deterrent to those who would knowingly facilitate the illegal trade in cultural property.[6] To date, 137 member states of UNESCO have ratified the Convention.

Switzerland passed the Federal Act on the International Transfer of Cultural Property, or "CPTA," to implement the UNESCO Convention.[7] Switzerland expressed its "desire[] to make a contribution to the maintenance of the cultural heritage of mankind and prevent theft, looting, and illicit import and export of cultural property." CPTA, art. 1(2). The CTPA provides that, when there is "reasonable suspicion that criminal activity is present under this Act," a complaint will be filed with the competent criminal authorities. CPTA, art. 17(2). Separately, Swiss customs officials are authorized to "inspect the transfer of cultural property at the border" and to "withhold suspicious cultural property during import, transit, and export," and also to "report it to criminal prosecution authorities." CPTA, art. 19(1), (2). Under the CPTA, "[t]he competent criminal prosecution authorities will order the seizure of the cultural property when suspicion exists that the cultural property was stolen, lost against the will of the owner or illicitly imported into Switzerland." CPTA, art. 20(1).

In the United States, the Cultural Property Implementation Act empowers federal authorities to seize antiquities in the United States when the U.S. Government makes an initial showing that the property is subject to import restrictions; it is then incumbent on the claimant to establish by a preponderance of the evidence that his property is not subject to forfeiture. *See* Pub. L. 97-446 (1983), as amended and codified at 19 U.S.C. § 2602–13; *United States v.*

---

[6] Civil forfeiture is one such remedy. In a related civil forfeiture action, one judge "express[ed] concern about what the record in this case reveals about the illicit trade in antiquities." *United States v. Mask of Ka-Nefer-Nefer*, 752 F.3d 737, 745 (8th Cir. 2014) (Murphy, J., concurring). The U.S. government had pleaded "that the dealers … 'knew or were willfully blind' to facts including the Masks' ownership by Egypt, ineligibility for private ownership, and lack of a proper license," and "[t]he mask was sold to the museum in 1998 by Phoenix Ancient Art, S.A.," whose "owners, Ali and Hicham Aboutaam, were each convicted in 2004 of smuggling ancient artifacts." *Id.* at 745 n.9.

[7] Federal Act of the International Transfer of Cultural Property, https://tinyurl.com/yc2dsavr (English translation).

*Eighteenth Century Peruvian Oil on Canvas*, 597 F. Supp. 2d 618, 623 (E.D. Va. 2009). The United States' purpose in enacting this law was to advance "greater international cooperation towards preserving cultural treasures that not only are of importance to the nations whence they originate, but also to a greater international understanding of our common heritage." *United States v. Schultz*, 333 F.3d 393, 408 (2d Cir. 2003) (quoting S. Rep. No. 97-564, at 21).

      **C.**     **Swiss Proceedings**

On February 24, 2017, the Public Prosecutor's Office of Geneva issued a Search and Seizure Order that named as Defendants Ali Aboutaam, Biliana Aboutaam, Inanna Art Services, S.A., and several others. *Aboutaam* Dkt. 1-1 at 6.[8] The Search and Seizure Order referred to two complaints filed by the Federal Office of Culture and Federal Customs Administration on January 17 and February 10, 2017. *Id.* The first complaint concerned "seven objects of suspicious provenance or origin held by Inanna Art Services, S.A.," and that were transferred to the Public Prosecutor's Office. The second concerned "the sudden and suspicious move at the end of December 2016 by those close to Inanna … specifically by Biliana Aboutaam … of a number of articles of cultural property stored outside of customs in a depot in Geneva." *Id.*

The Search and Seizure Order then stated that "the aforementioned defendants are suspected by the Public Prosecutor's Office of Geneva of receiving stolen goods (Article 160 of the Criminal Code) and of the infraction of Article 24 of the [Swiss law on the transfer of cultural property] …." *Id.* There were "grounds for presuming that locations possessed or used directly or indirectly by Inanna Art Services or the companies controlled by Ali Aboutaam,"

---

[8] The Court may consider the Swiss orders on this motion to dismiss. Plaintiffs attached those orders to the complaints and incorporated them by reference. *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 230–31 (2d Cir. 2016). The Court need not accept as true allegations that are "contradicted by other matters asserted or relied upon or incorporated by reference." *Xi Wei Lin v. Chinese Staff & Workers Ass'n*, No. 11-cv-3944, 2012 WL 5457493, at *4 (S.D.N.Y. Nov. 8, 2012). English quotations of the Swiss orders are taken from the translations attached to Plaintiffs' complaints.

including specifically "Phoenix Ancient Art," would "contain information, articles, or objects likely to be[] seized." *Id.* As the Search and Seizure Order recounted, the Order extended to objects that had been "moved by night from a warehouse in Geneva to a place that is unknown at present," and for which there was no apparent documentation. *Id.* at 7. The Prosecutor ordered the search of "companies controlled by Ali Aboutaam within the canton of Geneva," and the seizure of "all objects, electronic devices, documents, or assets that might be [i] restored to the injured parties, [ii] confiscated, [iii] seized with a view to executing a compensation claim, or [iv] used as evidence." *Id.* at 7–8.

The Search and Seizure Order specifically disclosed the availability of judicial review:

> **This decision may be subject to an appeal formulated at the criminal board of appeals of the Court of justice, P.O. Box 3108, 1211 Geneva 3, by filing the written and justifiable conclusions within a period of 10 days of being notified of this decision (Article 393, paragraph 1, letter a of the Criminal Procedure Code).**

*Id.* at 8 (bold font in original).

The Federal Customs Administration (Customs Anti-Fraud Section) also issued a Search Warrant days later to be performed at the home of Biliana Aboutaam on February 28, 2017. *Aboutaam* Dkt. 1-2 at 13. The reason for the Search Warrant was "importation without declaration/fencing archeological property/antiques." *Id.*[9] On February 28, 2017, the Federal Customs Administration executed the Search Warrant on the property of Biliana Aboutaam.

---

[9] Specifically, on December 20, 2016, Swiss border patrol stopped a car that was registered to Phoenix, whereupon "[a]n inspection of the two people allowed the [customs] officer to certify that [one of the passengers] was in possession of an antique oil lamp that had been fraudulently imported." *Aboutaam* Dkt. 1-2 at 13. An inspection of the car revealed the rental of several storage units, and the Federal Customs Administration's inquiry with that company established that, "following this interception [of the car], several movements of merchandise were certified beginning in the early hours of 12/21/2016," and Biliana Aboutaam "was identified on the surveillance cameras on this occasion." *Id.* The Federal Customs Administration had "a strong suspicion that other fraudulent importations of archeological property may have occurred and that they were stored on these premises." *Id.* The Search Warrant provided that the "criminal customs inquiry" was being conducted for various infractions of Swiss law, including "the customs law dated March 15, 2005 (LD; RS 631.0), as well as for infraction of the law on VAT dated June 12, 2009 (LTVA; RS 641.20), and for infraction of the federal law [dated] March 22, 1974 on administrative criminal law (DPA; RS 313.0), specifically Article 14, paragraph 4 thereof." *Id.*

*Id*. at 14. As set forth in a Customs Lien Seizure Report from that same date, "by virtue of articles 82 and 83 of the customs law dated March 18, 2005," the Swiss customs officers "seized as a customs lien" a total of 111 pieces of art and antiques identified in a list, as well as a marble statute. *Id*. at 14. The seized objects "have been left with their holder," rather than taken by authorities, although the holder was prohibited from disposing of them. *Id*.[10]

Directly below the line where Biliana Aboutaam signed, the Lien Seizure Report specifically stated: "**See the instructions regarding your legal rights on the back!**" *Id*. (bold font in original). The back of the Lien Seizure Report provided excerpts of relevant customs laws and further provided:

> **Legal recourse:**
>
> **Seizure is subject to appeal. The appeal must be addressed in writing within a deadline of 30 days from the notification of the decision to the Arrondissement Office, P.O. Box 1211, Geneva 28**.

*Id*. at 15 (bold font in original). Plaintiffs appealed neither the Search and Seizure Order nor the act of seizure carried out on February 28, 2017.

As a result of these actions by the Swiss authorities, Hicham alleges that "approximately 1,200 of [his] antiquities which were located in a warehouse and elsewhere in Geneva, Switzerland" were subject to an "unlawful seizure." AC ¶ 1. The Beierwaltes allege that 18 of their antiquities which had been consigned to Phoenix were seized from the Geneva warehouse by the Swiss authorities on February 28, 2017. BC ¶¶ 2, 3. The Plaintiffs acknowledge that Defendants have not removed this property from Geneva, where it continues to be stored. AC ¶ 4 n.2; BC ¶ 3 n.2.

---

[10] Although the Complaints do not refer to Biliana Aboutaam, there is no dispute that the Search Warrant executed on February 28, 2017, resulted in the seizure of the property Plaintiff Hicham claims in this case. *See* AC ¶ 33.

On May 7, 2018, the Beierwaltes and Hicham, through counsel, each wrote to the Geneva Public Prosecutor a "Demand for Release of Antiquities." *Aboutaam* Dkt. 1-3 at 2; *Beierwaltes* Dkt. 1-3 at 2. The Geneva Public Prosecutor responded to both letters on May 11, 2018, and requested documentation about acquisition of the objects over which the Plaintiffs claimed ownership, the provenance of the objects or "due diligence," remittance of the objects in question to Phoenix, and information about the Beierwaltes bankruptcy proceeding. *See Aboutaam* Dkt. 1-4 at 5; *Beierwaltes* Dkt. 1-4 at 5. The Geneva prosecutor further sought to question the Beierwaltes and Hicham and asked for their availability. As to Plaintiffs' demand for immediate release of the objects, the prosecutor responded that "the objects that have been seized are suspected to be the products of property infractions or of infractions against the Swiss law on the transfer of cultural property. Analyses and expert opinions are being made. Until such time as these explanations are made and your determination regarding the conflict of interest is provided, your request for the seizure to be lifted cannot be immediately granted." *Id.* The Geneva prosecutor informed Plaintiffs' counsel of the right to appeal this decision "with the Court Clerk of the Criminal Appeal Chambers of the Court of Justice within a period of ten days from the receipt of this letter, pursuant to Articles 393 and all following articles of the Swiss Criminal Procedure Code." *Id.*

Counsel for Hicham and the Beierwaltes did not appeal the Geneva prosecutor's decision. Instead, counsel sent another "Demand for Release of Antiquities" to the Swiss Customs Administration, the Swiss Office of Culture, and the Canton of Geneva, this time threatening to "commence litigation in U.S. court against the Swiss federal government and the Canton of Geneva" if their antiquities were not released. *Aboutaam* Dkt. 1-5 at 2. The Geneva prosecutor again responded, noting that its request for information "has not been answered to this day," and

that "[w]ithout your cooperation, the Public Prosecutor's Office will simply not be able to rule upon your request" to release the seized property. *Aboutaam* Dkt. 1-8 at 5. Still, the Geneva prosecutor emphasized that "[w]e hope that we have convinced you with these lines that your collaboration is essential to the establishment of the facts." *Id.* at 6.

With respect to the threat that Hicham and the Beierwaltes would sue the Swiss government in U.S. court, the Geneva prosecutor stated that, "[i]n doing so, you would be attempting to free yourself of the obligations that Swiss law imposes upon parties in criminal proceedings," and disputed the Plaintiffs' erroneous contention that "the Swiss State legal and administrative authorities' performance of their functions and duties within the scope of the law" constitutes "a crime (theft)." *Id.* The prosecutor concluded that any lawsuit in the United States against Swiss authorities would be contested for lack of jurisdiction and would not be compatible "with the principles governing relations between Switzerland and the United States." *Id.*

In August 2018, the Beierwaltes filed suit against the Swiss Office of Culture, the Swiss Customs Administration, and the Canton of Geneva in federal district court in Colorado alleging expropriation of 18 seized antiquities that the Beierwaltes claim to own. In September 2018, Hicham filed suit against the same defendants in federal district court in New York. The parties agreed to transfer the Colorado action to New York given the similarities in the issues presented.

## STANDARD OF REVIEW

The Foreign Sovereign Immunities Act (FSIA), 28 U.S.C. §§ 1330, 1602–11, "provides the sole basis for obtaining jurisdiction over a foreign sovereign in federal court." *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 439 (1989). The FSIA declares that foreign states are "presumptively immune from the jurisdiction of United States courts," unless a specific statutory exception to immunity applies. *Saudi Arabia v. Nelson*, 507 U.S. 349, 355

9

(1993). The Act's exceptions to immunity are "narrowly drawn." *McKesson Corp. v. Islamic Republic of Iran*, 672 F.3d 1066, 1075 (D.C. Cir. 2012).

A defendant in an FSIA case may mount either a facial or factual challenge to the court's jurisdiction in a Rule 12(b)(1) motion. *See Hulton v. Bayerische Staatsgemaldesammlungen*, --- F. Supp. 3d ---, 2018 WL 4757949, at *2 (S.D.N.Y. Sept. 28, 2018). Once a defendant makes a *prima facie* case that it is a foreign sovereign, the burden shifts to the plaintiff to "demonstrate that the foreign sovereign lacks immunity due to an FSIA exception." *Chettri v. Nepal Rastra Bank*, 834 F.3d 50, 55 (2d Cir. 2016).

To survive a Rule 12(b)(6) motion, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Kashef v. BNP Paribas SA*, 316 F. Supp. 3d 770, 775–76 (S.D.N.Y. 2018) (act of state doctrine); *Oui Fin. LLC v. Dellar*, No. 12-cv-7744, 2013 WL 5568732, at *1 (S.D.N.Y. Oct. 9, 2013) (international comity). Legal conclusions are not presumed true, *Iqbal*, 556 U.S. at 678, and the Court may consider "any written instrument attached to [the complaint] as an exhibit or any statements or documents incorporated in [the complaint] by reference," *Nicosia*, 834 F.3d at 230.

## ARGUMENT

The Complaints should be dismissed on three grounds. First, Geneva is immune from suit under the FSIA. Second, the Complaints impermissibly challenge quintessential acts of state. Third, Plaintiffs' arguments should be raised in Switzerland, not in the United States.

## I.      Geneva Is Immune From Suit Under the FSIA

"[A] foreign state shall be immune from the jurisdiction of the courts of the United States," unless the lawsuit establishes a specific exception to immunity set forth in the FSIA. 28 U.S.C. § 1604. The FSIA defines "foreign state" to "include[] a political subdivision of a foreign state or an agency or instrumentality of a foreign state." *Id*. § 1603(a). Plaintiffs admit

that the Canton of Geneva is a "foreign state" presumptively entitled to immunity. *See* AC ¶ 20; BC ¶ 19. Accordingly, unless Plaintiffs' complaints establish that their claims fall within an exception to immunity, this Court lacks jurisdiction.

Plaintiffs invoke only one exception to Geneva's presumptive immunity, the so-called "expropriation exception." AC ¶¶ 13, 15; BC ¶¶ 12, 14. To establish subject-matter jurisdiction under the expropriation exception, "a plaintiff must demonstrate each of four elements":

> (1) that rights in property are at issue;
>
> (2) that the property was "taken";
>
> (3) that the taking was in violation of international law; *and either*
>
> (4)(a) "that property … is present in the United States in connection with a commercial activity carried on in the United States by the foreign state," *or*
>
> (4)(b) "that property … is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States."

*Garb v. Republic of Poland*, 440 F.3d 579, 588 (2d Cir. 2006) (quoting 28 U.S.C. § 1605(a)(3)); *see also Hulton*, 2018 WL 4757949, at *2 (plaintiffs' burden).

The expropriation exception does not apply here for three independent reasons. First, Plaintiffs have not alleged that property was "taken" within the meaning of the FSIA. Second, Plaintiffs have not alleged that property was taken "in violation of international law." And third, Plaintiffs have not alleged a requisite nexus with the United States.[11]

## A.    Plaintiffs' Property Was Not "Taken"

The Complaints allege that Swiss authorities "seized" or "froze" Plaintiffs' property in the course of an ongoing criminal and customs investigation into potential theft of cultural

---

[11] Geneva reserves its right to contest other aspects of this suit, including whether "rights in property are at issue" and whether Plaintiffs have adequately pleaded sufficient "commercial activity" in the United States.

property. Any alleged deprivation of property rights in this context does not meet the expropriation exception's requirement that Plaintiffs' property be "taken."

"[T]he phrase 'taken in violation of international law' refers to 'the nationalization or expropriation of property without payment of the prompt, adequate and effective compensation required by international law,' including 'takings which are arbitrary or discriminatory in nature.'" *Zappia Middle E. Constr. Co. Ltd. v. Emirate of Abu Dhabi*, 215 F.3d 247, 251 (2d Cir. 2000) (quoting H.R. Rep. No. 94-1487, at 19 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6604, 6618)). Here, however, Geneva has not nationalized or expropriated Plaintiffs' property. Rather, a state prosecutor and the Swiss Customs Service have, pursuant to Swiss procedure and authority, restricted the movement of certain assets pending a criminal and customs investigation as to their origin and lawful ownership. The Canton of Geneva claims no property ownership right to the disputed antiquities.

The Second Circuit's decision in *Chettri v. Nepal Rastra Bank*, 834 F.3d 50 (2d Cir. 2016), controls here. The plaintiffs in *Chettri* supplied clothing and military equipment to entities in Nepal. After the plaintiffs made a sizable wire transfer to a bank in Nepal, the Nepalese Department of Revenue directed that the account be frozen "pending further investigation" based upon concerns of inadequate documentation of the source of the funds. *Id.* at 54. When the plaintiffs were unable to convince the Nepalese authorities that they had provided sufficient documentation, the plaintiffs filed suit in the United States and—as here—attempted to invoke the expropriation exception to foreign sovereign immunity. *Id.* at 58.

The Second Circuit in *Chettri* held that the "applicability of the takings exception founders … on the requirement that the rights in property must be 'taken in violation of international law.'" *Id.* The court rejected the plaintiffs' argument that, because the Nepalese

authorities had "froze[n] [the plaintiffs'] financial assets in connection with an ongoing money laundering investigation," that action was a "taking" under the expropriation exception. *Id.* The court found no authority to support plaintiffs' argument that such a "routine law enforcement action" constituted a "taking." *Id.* The Second Circuit affirmed dismissal.

The application of the FSIA in *Chettri* is consistent with the meaning of a "taking" in U.S. constitutional jurisprudence. "When property has been seized pursuant to the criminal laws or subjected to *in rem* forfeiture proceedings, such deprivations are not 'takings' for which the owner is entitled to compensation." *Acadia Tech., Inc. v. United States*, 458 F.3d 1327, 1331 (Fed. Cir. 2006) (citing, *e.g.*, *Bennis v. Michigan*, 516 U.S. 442, 452–53 (1996)); *AmeriSource Corp. v. United States*, 525 F.3d 1149, 1153 (Fed. Cir. 2008) ("Once the government has lawfully seized property to be used as evidence in a criminal prosecution, it has wide latitude to retain it so long as the investigation continues, regardless of the effect on that property").

Several cases illustrate the point. In *Acadia Tech*, the U.S. Customs Service seized Acadia's property (cooling fans for computer CPUs) on the belief that they contained unauthorized and counterfeit trademarks. 458 F.3d at 1328–29. Several years passed before the Department of Justice filed a forfeiture action on the property. By the time the case was resolved and the fans returned to Acadia, they were "obsolete" and their value diminished. *Id.* at 1329. Nevertheless, the court held that because "the property [was] seized as evidence in a criminal investigation or as the suspected instrumentality of the crime," there was no taking. *Id.* at 1331. Similarly, when the U.S. Attorney's Office seized pharmaceuticals from a warehouse in connection with an investigation into unlawful distribution of pharmaceuticals and money laundering, the court held that the seizure was an exercise of the government's police power, not a taking. *AmeriSource Corp.*, 525 F.3d at 1150, 1153–55; *see also In re 650 Fifth Ave. & Related*

*Props.*, 777 F. Supp. 2d 529, 576 (S.D.N.Y. 2011) ("an *in rem* forfeiture of property involved in criminal activity is not a taking for which just compensation is required").

The Plaintiffs acknowledge that Geneva and the Swiss Federal Defendants informed Plaintiffs that the Swiss Penal Code "provides the basis for seizure," AC ¶ 5; BC ¶ 4, and that the Plaintiffs' property "is suspected of being in violation of the [Swiss law governing the international transfer of cultural property]," AC ¶ 36; BC ¶ 41. The underlying documents confirm this description. *See Aboutaam* Dkt. 1-1 at 6. The Search and Seizure Order invoked Swiss Criminal Procedure Code Article 263 and set forth the grounds for the seizure. *Id.* The Order also invoked Swiss Criminal Procedure Code Article 241 and set forth parties, premises, property or records to be searched, the measure's purpose, and the authorities of the person authorized to conduct the measure. *Id.* at 7–8. Nothing more was required for the searches.

At bottom, these suits challenge Swiss federal and cantonal orders issued in the context of a criminal and customs investigation, and, as such, do not allege a taking under the FSIA.

### B.    Plaintiffs' Property Was Not Taken "In Violation Of International Law"

The Complaints also fail to establish that any property was taken "in violation of international law." 28 U.S.C. § 1605(a)(3). Again, the Second Circuit's decision in *Chettri* is dispositive. The panel held that the "freezing of [plaintiffs'] account … in connection with an ongoing money laundering investigation" did not plausibly allege "a taking, much less a taking 'in violation of international law.'" 834 F.3d at 58. The court reasoned that the plaintiffs' criticisms about "the manner in which Nepal has conducted its investigation are insufficient to prove a violation of international law." *Id.* That holding controls here.

Other courts have reached the same conclusion with respect to claims challenging the Swiss government's authority to freeze assets during a criminal investigation. In *Hilsenrath v. Swiss Confederation*, the plaintiffs alleged that Swiss officials had "ordered the freezing of assets

held by the Hilsenraths in two banks … because it was suspected that the assets were stolen." *Hilsenrath*, No. 07-cv-2782, 2007 WL 3119833, at *1 (N.D. Cal. Oct. 23, 2007). The plaintiffs alleged that the United States notified Swiss authorities that the asset freeze "was not warranted by any prosecution pending in the United States." *Id*. When the assets nevertheless remained frozen two years later, the plaintiffs sued the Swiss Confederation and the Federal Attorney General of Switzerland. *Id*. at *1–2.

The district court dismissed the suit and held that "[i]t is frivolous to claim that freezing assets during a legitimate criminal investigation violated international law." *Id.* at *4. The court observed that the plaintiffs' allegations had merely shown that the Swiss government had "exercised powers peculiar to sovereigns—they investigated Mr. Hilsenrath's criminal activities in Switzerland and other countries, issued a warrant for his arrest, and froze his assets pending criminal investigation." *Id*. The Ninth Circuit affirmed, holding that the district court "properly dismissed" the plaintiffs' claims that the Swiss federal authorities violated the law "when they froze the Hilsenraths' Swiss bank assets during the course of a criminal investigation into allegedly illicit financial dealings." *Hilsenrath v. Swiss Confederation*, 402 F. App'x 314, 315 (9th Cir. 2010). Accordingly, the Ninth Circuit concluded that the plaintiffs "did not establish the applicability of any of the FSIA's exceptions to sovereign immunity." *Id*.

Indeed, every court to consider this issue agrees that a sovereign's act of temporarily freezing assets pursuant to its regulatory, judicial, or administrative process, or in connection with an ongoing investigation, is not a taking in violation of international law. *See, e.g.*, *Official Stanford Invs. Comm. v. Bank of Antigua*, No. 13-cv-762, 2018 WL 3956470, at *4 (N.D. Tex. Aug. 17, 2018) (rejecting application of the expropriation exception because foreign sovereign's "seizure of the [Bank of Antigua] was a routine, regulatory activity of a government"); *Best Med.*

*Belgium, Inc. v. Kingdom of Belgium*, 913 F. Supp. 2d 230, 239 (E.D. Va. 2012) ("judicial administration and sale of a financially struggling company is not a taking"); *Zapolski v. Fed. Rep. of Germany*, No. 09-cv-1503, 2010 WL 1816327, at *1–2 (E.D.N.Y. May 4, 2010) (the expropriation exception did not cover bank's closure or freezing of plaintiffs' accounts in response to letters from German tax authorities); *Greenpeace, Inc. (U.S.A.) v. State of France*, 946 F. Supp. 773, 783 (C.D. Cal. 1996) (seizure of ships was not a taking in violation of international law, as "the impoundment was necessary to France's investigation of Greenpeace's numerous alleged violations of international law"); *see also* Restatement (Second) of Foreign Relations Law § 192, Rep. Note 2 ("the temporary blocking or freezing of the accounts of aliens within the territory of a state, suspending the right of withdrawal but not affecting ownership, does not appear to have been regarded as a taking of property").

Contrary to Plaintiffs' legal characterization, to which no deference is owed, the property at issue here was not taken in violation of international law. Rather, the property was frozen pursuant to an ongoing criminal and customs investigation authorized by Swiss law. Indeed, Geneva's actions in this matter are *compelled* by international law. In 2003, the Swiss Confederation became a State Party to the UNESCO Convention—a foundational treaty "to protect articles of cultural significance from 'the dangers of theft, clandestine excavation, and illicit export.'" *Ancient Coin Collectors Guild v. U.S. Customs & Border Protection*, 698 F.3d 171, 175 (4th Cir. 2012). The Convention "calls for concerted action among nations to prevent trade in specific items of cultural property in emergency situations," *Autocephalous Greek-Orthodox Church of Cyprus v. Goldberg & Feldman Fine Arts, Inc.*, 917 F.2d 278, 297 (7th Cir. 1990), and compels States Parties to "prevent by all appropriate means transfers of ownership of cultural property likely to promote the illicit import or export of such property," Convention, art.

16

13(a). The Swiss domestic legislation—the CPTA—that implemented the treaty adapts Swiss laws regulating the art trade and exchange of cultural property to minimum standards under international law set forth in the Convention. *See supra* pp. 3–4. Under this law, Swiss prosecutors "will order the seizure of the cultural property when suspicion exists that the cultural property was stolen, lost against the will of the owner or illicitly imported into Switzerland. CPTA, art. 20. Far from violating international law, the sovereign activities in dispute here "contribut[e] to the maintenance of the cultural heritage of mankind and prevent[s] theft, looting, and illicit import and export of cultural property." CPTA, art. 1(2).

### C.      Plaintiffs' Claims Against Geneva Do Not Have the Requisite Nexus with the United States

Plaintiffs' invocation of the expropriation exception also fails because Plaintiffs cannot establish the requisite "nexus" element to the United States. The FSIA provides two ways to establish a sufficient U.S. nexus:

> First, a plaintiff can allege "that property … is present in the United States in connection with a commercial activity carried on in the United States by the foreign state." *Garb*, 440 F.3d at 588; or

> Second, a plaintiff can allege "that property … is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States." *Id.*

Only the first option is relevant here because, as explained below, Geneva is a political subdivision of Switzerland, not an agency or instrumentality.

The FSIA defines a "foreign state" to include the foreign state proper (*e.g.*, the Swiss Confederation), its political subdivisions (the cantons, among other entities), and its agencies or instrumentalities. 28 U.S.C. § 1603(a). Sometimes, however, Congress distinguished between foreign states and their political subdivisions, on the one hand, and agencies and instrumentalities, on the other. The nexus requirement of Section 1605(a)(3) is one such

17

example, in which Congress set a higher bar to establish jurisdiction over foreign states and their political subdivisions. The House Report to the FSIA explained that the first clause of the nexus requirement—concerning when property is *present* in the United States—applies to a "foreign state, or political subdivision, agency or instrumentality of the foreign state." H.R. Rep. 94-1487, at 19 (1976). In contrast, the House Report explained that the second clause—which extends even to property *outside* the United States—applied only to an "agency or instrumentality of a foreign state." *Id.*

The Second Circuit explained in *Garb v. Republic of Poland*, 440 F.3d 579 (2d Cir. 2006), that "[t]he first of these alternative showings sets a higher threshold of proof for suing foreign states in connection with alleged takings by requiring that the property at issue be 'present in the United States.'" *Id.* at 589. To invoke the more lenient second clause, Plaintiffs must first establish that the defendant is "agency or instrumentality." *Id.*; *see also de Csepel v. Republic of Hungary*, 859 F.3d 1094, 1107–08 (D.C. Cir. 2017), *cert. denied*, 2019 WL 113526 (Jan. 7, 2019). The United States recently explained to the Supreme Court that the FSIA's "text and structure" "establish[ed] two distinct tracks for obtaining jurisdiction, depending on the kind of entity whose immunity is at stake." Br. for United States as Amicus Curiae at 11, *de Csepel v. Republic of Hungary* (17-1165) (U.S. Dec. 4, 2018). The United States contrasted the first, "stricter 'foreign state' nexus," with the "looser 'agency or instrumentality' nexus." *Id.* In that case, because the Republic of Hungary—a "foreign state" and not an "agency or instrumentality"—was sued and the property remained in Hungary, the United States concluded that "Hungary is immune from suit." *Id.* at 8.

The Canton of Geneva is a political subdivision of the Swiss Confederation, not an "agency or instrumentality" of the Swiss government. "The term 'political subdivisions' includes

all governmental units beneath the central government, *including local governments*." H.R. Rep. No. 94-1487, at 15 (1976) (emphasis added). In the section on "immunity of political subdivisions," the Restatement (Third) of Foreign Relations Law explains that under the "United States Foreign Sovereign Immunities Act … constituent units of federal unions"—"*e.g.*, provinces, *cantons*, States"—"are entitled to sovereign immunity *to the same extent* as the federal state itself." Restatement (Third) § 452 cmt. b (emphases added); *see also id.* Rep. Note 1 ("political subdivisions that have a status comparable to that of States of the United States have been held immune as sovereigns"); Restatement (Fourth) of Foreign Relations Law § 452, Rep. Note 2 ("States and provinces are political subdivisions under the FSIA.").

Courts uniformly agree. The Second Circuit has explained that the term "political subdivisions" includes "units of local government," and that "all governmental units beneath the central government … constitute 'political subdivisions.'" *Garb*, 440 F.3d at 596, 597 n.2. Regional or sub-national governments are "political subdivisions" of a foreign central government. *See, e.g.*, *Big Sky Network Canada, Ltd. v. Sichuan Provincial Government*, 533 F.3d 1183, 1189 (10th Cir. 2008) ("While not literally 'foreign states' themselves in the common meaning of that term, Sichuan Province and Qingyang District are political subdivisions of the People's Republic of China, and … political subdivisions of foreign states are 'foreign states' within the meaning of the FSIA.").[12] Under this consistent and common-sense interpretation, the

---

[12] *See also Schoeps v. Freistaat Bayern*, 611 F. App'x 32, 33 n.1 (2d Cir. 2015) ("For purposes of the FSIA, a 'foreign state' includes 'a political subdivision of a foreign state,' such as Bavaria, a constituent state of the Federal Republic of Germany."); *Rong v. Liaoning Provincial Government*, 452 F.3d 883, 885 (D.C. Cir. 2006) (analyzing provincial government as a "subdivision of China"); *Pablo Star, Ltd. v. Welsh Government*, 170 F. Supp. 3d 597, 602 (S.D.N.Y. 2016) (analyzing Wales as a "political subdivision of the United Kingdom"); *State Farm Mut. Auto. Ins. Co. v. Ins. Co. of British Columbia*, No. 09-cv-762, 2010 WL 331786, at *3 (D. Ore. Jan. 25, 2010) (describing "the provincial government of British Columbia" as "a political subdivision of Canada"); *Wasserstein Perella Emerging Mkts. Fin., L.P. v. Province of Formosa*, No. 97-cv-793, 2002 WL 1453831, at *7 (S.D.N.Y. July 2, 2002) ("A political subdivision, like the Province [of Formosa, Argentina], is a foreign state for purposes of the FSIA.").

Canton of Geneva is indisputably a political subdivision. Even Plaintiffs concede that the Canton of Geneva is "a territorial division in Switzerland." AB ¶ 12; BC ¶ 11.[13]

In this case, Plaintiffs do not allege that the property at issue is "present in the United States"—in fact, they allege that the property was seized in Switzerland and remains there. AC ¶ 1 (antiquities "were located in a warehouse and elsewhere in Geneva, Switzerland at the time of their seizure"); BC ¶ 2 ("This case concerns 18 antiquities belonging to the Beierwaltes, which are located in Geneva, Switzerland."); AC ¶ 4 n.2 ("The Defendants have not removed the Hicham U.S. Property from the Geneva warehouse and elsewhere in which it is stored."); BC ¶ 3 n.2 ("The Defendants have not removed the Beierwaltes Property from the Geneva warehouse in which it is stored."). Plaintiffs thus cannot satisfy the U.S. nexus element of Section 1605(a)(3).

Because Plaintiffs fail to establish the requirements of the expropriation exception, this Court must dismiss for lack of jurisdiction. *Zappia Middle E. Constr. Co.*, 215 F.3d at 251.

## II.     The Act of State Doctrine Bars Plaintiffs' Claims

Plaintiffs' claims are also barred by the act of state doctrine. That doctrine "precludes any review whatever of the acts of the government of one sovereign State done within its borders by the courts of another sovereign State." *FTE v. Spirits Int'l B.V.*, 809 F.3d 737, 743 (2d Cir. 2016). The act of state doctrine "is not some vague doctrine of abstention but a principle of decision binding on federal and state courts alike." *Id.* (quoting *W.S. Kirkpatrick & Co. v. Envt'l Tectonics Corp., Int'l*, 493 U.S. 400, 406 (1990)). The doctrine bars an action when (1) there is an "official act of a foreign sovereign performed within its own territory," and (2) "the relief

---

[13] Plaintiffs allege that Geneva is an agency or instrumentality of the Swiss Confederation. *See* AC ¶ 20; BC ¶ 19. Plaintiffs' incorrect legal conclusion is not entitled to the presumption of truth, *see Iqbal*, 556 U.S. at 678. In any event, plaintiffs' characterization is contrary to Circuit precedent, the Restatement, and numerous other authoritative determinations that regional governments like a province or canton are "political subdivisions."

sought or defense interposed [in the action would require] a court in the United States to declare invalid the [foreign sovereign's] official act." *W.S. Kirkpatrick & Co.*, 493 U.S. at 405.

A "freeze" order constitutes an official act of a foreign sovereign. In *Credit Suisse v. U.S. District Court for the Central District of California*, 130 F.3d 1342, 1344 (9th Cir. 1997), the Ninth Circuit took the extraordinary step of granting a petition for mandamus because the district court's decision to challenge a Swiss asset freeze order plainly "violate[d] the act of state doctrine." In *Credit Suisse*, the Swiss Federal Council issued an "Executive Order freezing all assets of the Marcos family that were held in Switzerland," followed by "cantonal orders" that the Canton of Geneva and other cantons issued to "freez[e] all assets belonging directly or indirectly to Marcos and/or his family." *Id.* at 1346–47. "The cantonal freeze orders remain[ed] in effect" as of the Ninth Circuit's ruling. *Id.* at 1347. The Ninth Circuit held that "Switzerland's act of issuing first the Executive Order and then the cantonal freeze orders pursuant to [the Swiss Federal Act on Mutual Assistance Matters] was 'paradigmatically sovereign in nature,'" and was "not the type of act that a private person can exercise." *Id.* (citation and brackets omitted). Therefore, these orders were "clearly an 'official act of a foreign sovereign performed within its own territory,'" which triggered the act of state doctrine. *Id.* (quoting *W.S. Kirkpatrick & Co.*, 493 U.S. at 405).

Plaintiffs here are challenging the Geneva Public Prosecutor's Search & Seizure Order of February 24, 2017, and the Swiss Federal Customs Administrations' Search Warrant and Seizure Report, which "seized" art and antiquities and "prohibited [their holder] from disposing of them," *Aboutaam* Dkt. 1-1, at 6; Dkt. 1-2, at 14, 15; *see also* AC ¶ 33 ("On February 24, 2017, the Geneva Prosecutor issued an 'Ordonnance de Perquisition et de Séquestre'—a search and seizure order—as to these objects."); ¶¶ 34, 42; BC ¶¶ 36, 38. As in *Credit Suisse*, the Plaintiffs

21

characterize these orders as "freezing" their assets. *See, e.g.*, AC ¶¶ 1, 4 n.2 ("this Complaint uses the terms 'freeze,' 'seize,' 'seizure,' and their derivations interchangeably," because these actions "'freezing' the Hicham U.S. property … amount[] to a seizure"); BC ¶ 3 n.2 (same).[14] These were official acts of a foreign sovereign; they are "not the type of act that a private person can exercise," *Credit Suisse*, 130 F.3d at 1344 (citation and brackets omitted). Nor is there any dispute that the acts were done within the territory of the sovereign. *See, e.g.*, AC ¶ 4 (alleging Defendants acted unlawfully "by wrongfully seizing the Hicham U.S. Property at a Geneva warehouse"); BC ¶ 4 (same, with respect to Beierwaltes property).

The second element of the act-of-state test is met because the relief sought by Plaintiffs necessarily calls into question the validity of the Swiss orders and attendant seizure. The Complaints ask this Court to "enter an order" (1) declaring the Beierwaltes and Hicham "to be the true, lawful, and exclusive owners" of the disputed property, and (2) "requiring the Defendants to relinquish possession of" and "immediately return" the disputed property, and to permit "unrestricted marketing, sale, import and export" of the disputed property, including in Switzerland. AC ¶ 55; BC ¶ 57. The relief sought would not only require this Court to question the validity of the freeze orders but would necessarily render those foreign orders invalid by demanding a foreign government to release property it has frozen.

The fact that these orders were issued in Swiss criminal and customs proceedings amplifies the need for judicial restraint. In *Nocula v. UGS Corp.*, 520 F.3d 719 (7th Cir. 2008), the Seventh Circuit dismissed on act of state grounds a lawsuit that raised much more sympathetic facts. The defendant maliciously instituted a criminal prosecution against the

---

[14] If the allegations are characterized as a "seizure" instead of a freeze, they still would be covered by the act of state doctrine. *See, e.g.*, *Garcia v. Chase Manhattan Bank, N.A.*, 735 F.2d 645, 650 (2d Cir. 1984) ("if the situs of Chase's debt to Garcia were in Cuba, the Cuban government could validly seize it"); *Empresa Cubana Exportadora, Inc. v. Lamborn & Co.*, 652 F.2d 231, 237 (2d Cir. 1981) (similar).

plaintiff in Poland. *Id.* at 721. "In connection with the ensuing prosecution, Polish police seized [the plaintiff's] computers," and, regrettably, lost the computers and all the data stored thereon. After the foreign prosecution "ended in a verdict for [plaintiff]," the plaintiff filed tort and contract claims against the offending company. The Seventh Circuit affirmed dismissal of the case on act of state grounds. The court reasoned that "[t]he decision of a foreign sovereign to exercise its police power through the enforcement of its criminal laws plainly qualifies as an act of state," and the court had "no trouble" in concluding that the Polish government's prosecution, "includ[ing] the seizure of the computers and their subsequent loss, is an act of state." *Id.* at 728.

Similarly, in *Nkana v. Federal Republic of Nigeria*, 238 F. Supp. 3d 17 (D.D.C. 2017), the court concluded that the act of state doctrine barred the plaintiff's claims that the Nigerian Attorney General had unlawfully referred him to a financial crimes commission, holding that, "whatever the merits of that contention … such a referral certainly amounts to an act of state that must be deemed valid …." *Id.* at 32. As the court recognized in *Nkana*, "[f]oremost among the prerogatives of sovereignty is the power to create and enforce a criminal code." *Id.* (citing *Heath v. Alabama*, 474 U.S. 82, 93 (1985)).

Plaintiffs seek compensation for the temporary seizure of antiquities that they admit was based upon Swiss authorities' concerns about the antiquities' provenance and that the Swiss criminal code had "provide[d] the basis for seizure." AC ¶¶ 5, 33, 36; BC ¶¶ 4, 35, 36, 44. Because these allegations arise out of the seizure of property pursuant to a foreign sovereign's freeze order issued in the course of a criminal and customs investigation, they are materially indistinguishable from *Credit Suisse* and *Nocula*. Accordingly, the act of state doctrine bars Plaintiffs' claims.

### III.   Comity Warrants Dismissal In Favor of Swiss Proceedings

Finally, this Court should dismiss these lawsuits in favor of resolution in Switzerland. The Swiss courts are a far more appropriate forum for Plaintiffs to challenge the seizure of their antiquities in Switzerland by Swiss authorities. Principles of international comity provide three separate justifications for dismissal.

First, these cases should be dismissed because they concern the same subject matter as ongoing criminal and customs proceedings in Switzerland. "Under principles of international comity, United States courts ordinarily … defer to proceedings taking place in foreign countries," *Spirits Int'l B.V.*, 809 F.3d at 742–43, and "[c]omity should be withheld only when its acceptance would be contrary or prejudicial to the interest of the nation called upon to give it effect," *Oui Financing LLC*, 2013 WL 5568732, at *4 (quoting *Cunard Steamship Co. v. Salen Reefer Servs. AB*, 773 F.2d 452, 457 (2d Cir. 1985)). Although "mere existence of parallel foreign proceedings" does not always warrant abstention, *Leopard Marine & Trad., Ltd. v. Easy Street Ltd.*, 896 F.3d 174, 190 (2d Cir. 2018), the presence of ongoing, related foreign criminal proceedings constitutes exceptional circumstances warranting deference, *see, e.g.*, *800537 Ontario, Inc. v. World Imports U.S.A., Inc.*, 145 F. Supp. 2d 288, 291 (W.D.N.Y. 2001) (staying civil suit pending conclusion of Canadian criminal actions against plaintiffs where "the fundamental issues to be resolved are substantially similar"). Under the circumstances, the Court should, at a minimum, defer to ongoing criminal proceedings in Switzerland.

Second, dismissal is appropriate because Plaintiffs have not even attempted to exhaust their remedies in Switzerland. "Principles of international comity make clear that these plaintiffs must attempt to exhaust" remedies in Switzerland, or provide a legally compelling reason why they have not done so, before the United States courts should be open to redress allegedly unlawful conduct by Swiss authorities. *Fischer v. Magyar Allamvasutak Zrt.*, 777 F.3d 847, 852

24

(7th Cir. 2015); *Abelesz v. Magyar Nemzeti Bank*, 692 F.3d 661, 678–86 (7th Cir. 2012); *Freund v. Republic of France*, 592 F. Supp. 2d 540, 575–79 (S.D.N.Y. 2008) (dismissing suit for plaintiffs' failure to avail themselves of available remedies in France), *aff'd*, 391 F. App'x 939 (2d Cir. 2010) (affirming on immunity grounds). Plaintiffs have not shown that judicial remedies in Switzerland "are clearly a sham or inadequate or that their application is unreasonably prolonged." *Fischer*, 777 F.3d at 853, 855. On the contrary, there is ample authority establishing Swiss courts as an "adequate forum" to resolve similar disputes. *See, e.g.*, *Yavuz v. 61 MM, Ltd.*, 576 F.3d 1166, 1175–77 (10th Cir. 2009) ("Swiss courts have routinely been held adequate for contract and tort claims similar to those Yavuz is raising here."); *Dickson Marine Inc. v. Panalpina, Inc.*, 179 F.3d 331, 342 (5th Cir. 1999) (similar). Indeed, Plaintiffs' main complaint is that the Prosecutor in Geneva did not provide, in Plaintiffs' estimation, sufficient citations to the Swiss penal and cultural property law when seizing the antiquities. They raise no objection to the quality or availability of Swiss courts to provide relief, if warranted. *See PT United Can Co. v. Crown Cork & Seal Co.*, 138 F.3d 65, 73 (2d Cir. 1998).

Third, as an extension of international comity, U.S. courts generally honor and recognize official acts of a foreign sovereign taken in accordance with its own laws. *See Spirits Int'l B.V.*, 809 F.3d at 742–43; *see also Moore v. Mitchell*, 30 F.2d 600, 604 (2d Cir. 1929) (L. Hand, J., concurring); *Hilton v. Guyot*, 159 U.S. 113 (1895). To be clear, the Canton of Geneva is not asking this Court to effectuate Swiss seizure orders. Rather, Plaintiffs seek a decision from this Court that the Swiss seizure orders are unlawful, under both Swiss and international law. Such a "declaration of a United States court" that the Swiss government "violated [its] own law … would be an affront to the government of a foreign sovereign," warranting dismissal on comity grounds. *Spirits Int'l B.V.*, 809 F.3d at 743.

25

**CONCLUSION**

For the foregoing reasons, Geneva respectfully requests that this Court dismiss these related actions.

Respectfully submitted,

ARNOLD & PORTER KAYE SCHOLER LLP

/s/ Marcus A. Asner
Marcus A. Asner
Mathieu Coquelet Ruiz, *pro hac vice*
250 W. 55th Street
New York, NY  10019-9710
(212) 836-7222
Marcus.Asner@arnoldporter.com
Mathieu.Ruiz@arnoldporter.com

R. Reeves Anderson, *pro hac vice*
370 Seventeenth Street, Suite 4400
Denver, CO 80202-1370
(303) 863-1000
Reeves.Anderson@arnoldporter.com