J787ABAC

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   --------------------------------x

3   HICHAM ABOUTAAM,

4                   Plaintiff,

5            v.                              18 Civ. 8248 (RA)

6   L'OFFICE FEDERALE DE ALA CULTURE
    DE LA CONFEDERATION SUISSE,
7   et al.,

8                   Defendants.

9   --------------------------------x
                                        New York, N.Y.
10                                      July 8, 2019
                                        3:00 p.m.
11
    Before:
12
                        HON. RONNIE ABRAMS
13
                                        District Judge
14
                            APPEARANCES
15
    MINTZ LEVIN COHN FERRIS GLOVSKY & POPEO PC
16       Attorneys for Plaintiff Hicham Aboutaam
    BY:  KEVIN AINSWORTH
17       PETER CHAVKIN

18  LAW OFFICE OF NATHANIEL Z. MARMUR PLLC
         Attorneys for Plaintiffs Lynda and William Beierwaltes
19  BY:  NATHANIEL MARMUR

20  PILLSBURY WINTHROP SHAW PITTMAN LLP
         Attorneys for Defendant L'Office Federale
21       de la Culture de la Confederation Suisse
    BY:  MICHAEL JAFFE
22       STEPHAN BECKER

23  ARNOLD & PORTER KAYE SCHOLER LLP
         Attorneys for Defendant
24       La Republique et Canton de Geneve
    BY:  R. REEVES ANDERSON
25       MARCUS ASNER

J787ABAC

```
1              (Case called)

2              (In open court)

3              MR. AINSWORTH:  Good afternoon, your Honor.  Kevin

4    Ainsworth with Mintz for plaintiff Hicham Aboutaam.

5              MR. CHAVKIN:  Your Honor, Peter Chavkin, also Mintz,

6    for Hicham Aboutaam.

7              MR. MARMUR:  Good afternoon, your Honor.  Nathaniel

8    Marmur, M-a-r-m-u-r, for the Beierwaltes.

9              MR. ANDERSON:  Good morning, your Honor.

10             MR. ABOUTAAM:  Good afternoon, your Honor.  I'm Hicham

11   Aboutaam.

12             THE COURT:  Yes, good afternoon to you.

13             MR. ANDERSON:  Reeves Anderson from Arnold & Porter

14   for the Republic and Canton of Geneva.

15             MR. ASNER:  Marcus Asner for Geneva.

16             MR. JAFFE:  Michael Jaffe from Pillsbury Winthrop on

17   behalf of the Federal defendants.

18             MR. BECKER:  Steven Becker from Pillsbury Winthrop,

19   also on behalf of the Swiss Federal defendants.

20             THE COURT:  All right.  So good afternoon all.  So,

21   we're here to discuss the pending motions to dismiss as well as

22   plaintiffs' request for jurisdictional discovery.  Who would

23   like to start on behalf of defendants?

24             MR. ANDERSON:  I will, your Honor.

25             THE COURT:  Yes.
```

J787ABAC

1          MR. ANDERSON:  First and foremost, the Foreign

2     Sovereign Immunities Act bars these suits, and I begin there

3     because, first, the immunity question is a threshold

4     jurisdictional question, and foremost because binding circuit

5     precedent forecloses these actions.  So, let's begin with what

6     is undisputed.  The defendants here are all foreign states, as

7     that term is defined in the Foreign Sovereign Immunities Act.

8     As such, they are entitled to presumptive immunity unless the

9     plaintiffs can establish that one of the narrow exceptions to

10    immunity applies.  And the only one that they're relying on so

11    far is the expropriation exception in 1605(a)(3).  So, while

12    they bear the burden on each of those, I want to focus on the

13    three aspects that were briefed in our motion.

14          So, the first -- and the statute has been described as

15    abstruse here, so if at any point I can clarify any points here

16    we're going to be unpacking a bit, please let me know.

17          The first is there is no taking.  In general, the

18    Second Circuit in the Zappia case defined a taking as the

19    expropriation or nationalization of property.  Here the

20    defendants claim no property right in the disputed antiquities.

21    At issue here is a freezing order pursuant to equivalent of a

22    search and seizure warrant issued by the Geneva prosecutor.

23    And the Second Circuit has addressed the specific application

24    in Chettri v. Nepal Rastra Bank.  And the court said that there

25    is no authority for the proposition that a routine law

J787ABAC

1    enforcement action constitutes a taking within the meaning of

2    1605(a)(3).

3         THE COURT:  Do you think it would make a difference if

4    the property was frozen for a longer period of time, if it was

5    frozen for five years or ten years?  At what point would it

6    become a taking?

7         MR. ANDERSON:  So, your Honor, I do believe, just as

8    under U.S. juris prudence, there is a period of time where

9    perhaps it could ripen into a taking, but here that has not yet

10   elapsed.  There are cases that extend far beyond the two years

11   that are at issue in this case.  In fact, Chettri is a good

12   example, the assets were frozen, the bank account in Chettri,

13   in 2008.  In 2011 the Nepalese regulators issued an order

14   actually confiscating that and indicting the defendant there on

15   money laundering charges.  In 2014 -- so six years after the

16   initial freezing -- this court vacated the default judgment and

17   dismissed the case under the Foreign Sovereign Immunities Act

18   and the Second Circuit affirmed.  So, a much longer period than

19   we have here.

20        Now, it could be an open question on indefinite

21   detention, but here there is an ongoing criminal investigation.

22   And by the evidence that the plaintiffs have attached to their

23   complaint and put into the record, they have established that a

24   number of the antiquities that were at dispute have already

25   been released.  The investigation is going on apace, and so it

J787ABAC

1    would be both premature to say that this is a taking but also

2    that it has ripened into one.  So, that's the first issue on

3    the taking.

4            And here I think the U.S. analog is important.  The

5    United States takes property all the time without triggering

6    the taking clause of the Fifth Amendment.  And the restatement

7    section -- the Restatement, Third, Foreign Relations Law,

8    Section 712 -- which the plaintiffs rely on -- makes it clear

9    that the line in international law is similar to that drawn in

10   United States juris prudence for purposes of the Fifth and

11   Fourteenth Amendment when determining whether there has been a

12   taking.

13           So, I would point the Court to the two cases that we

14   raised in the motion to dismiss by the federal circuit:  The

15   Acadia Tech case, as well as the Amerisource.  It said that

16   seizing evidence for either a criminal investigation or for use

17   in a criminal investigation is not a taking, and the innocence

18   of the claimant is irrelevant.

19           And the implications here of finding a taking would be

20   serious.  First, it would embroil U.S. courts in litigation

21   over prosecutorial actions taken all over the world.  Here this

22   is a routine criminal investigation where the plaintiffs admit

23   the proper procedures of the foreign jurisdiction were

24   followed.  If this court were to assert jurisdiction, there

25   would be many more cases like it to follow.

J787ABAC

1          Second, it would be holding foreign governments liable

2     for actions that the United States undertakes all the time.

3     So, since 2017 over $3 billion worth of assets have been

4     deposited into the Department of Justice's forfeiture fund.

5     The F.B.I., ATF, DEA seize over 700,000 assets annually

6     pursuant to the search and seizure rules and the forfeiture

7     rules of the United States.  We would be holding foreign

8     governments to a standard that the United States -- holding

9     them liable for actions the United States undertakes all the

10    time.

11         Unless your Honor has questions about takings, I would

12    like to turn to the "in violation of international law".

13         THE COURT:  Let's do that.  Thanks.

14         MR. ANDERSON:  So, again the Second Circuit's decision

15    in Chettri is dispositive here.  The complaint is really about

16    the criticisms that the Geneva prosecutor has undertaken so far

17    in this case.  And the Second Circuit said, "Criticisms about

18    the manner in which Nepal has conducted its investigation are

19    insufficient to prove a violation of international law."

20         In the Hilsenrath case -- which was also against the

21    Swiss Confederation in the Ninth Circuit -- they actually found

22    that argument frivolous.  "It is frivolous to claim that

23    freezing assets during a legitimate criminal investigation

24    violated international law."

25         THE COURT:  What in your view -- or when would a

J787ABAC

1    seizure be in violation of international law, in your view?

2    So, let's say a foreign sovereign took someone's property

3    without any justification or any property.  Would a U.S.

4    district court, you know, be permitted to get involved in that

5    point, and would immunity apply?

6         MR. ANDERSON:  So, in the Zappia case from the Second

7    Circuit they identified three circumstances that may constitute

8    a violation of international law:  If the property was not

9    taken for a public purpose.  So, if it was just taken for

10   private gain, let's say the president of the country likes your

11   car and just wants to take it, that's not OK.  So, not for a

12   public purpose.  The second is if it's discriminatory.  If it

13   particularly targets nationals of another state or of another

14   race, that would be a violation of international law.  And the

15   third is if it's not done for just compensation.  And here this

16   is where the parallel to the U.S. takings juris prudence is

17   important.  Just compensation is not required unless it is a

18   taking in the first instance.

19        So, those are the three examples identified by the

20   Second Circuit reflected in the restatement section on the

21   expropriation exception, and so those are the examples that I

22   would point to.

23        And I think it's important to note here that the

24   plaintiffs can't point to any case that is analogous where

25   there has either found to be a taking or a taking in violation

J787ABAC

1    of international law where a foreign government was exercising

2    its regulatory or police powers just as the Canton of Geneva

3    was doing here with the support of the Federal defendants as

4    well.

5          Finally, the U.S. nexus.  So, the Foreign Sovereign

6    Immunities Act is not a carte blanche invitation for U.S.

7    courts to exercise jurisdiction over foreign sovereigns.  There

8    must be some connection to the United States.

9          The Foreign Sovereign Immunities Act's expropriation

10   exception creates two distinct tracks which depend on the

11   nature of the Federal -- the foreign defendant.  So, the first

12   step is to identify which foreign state's immunity is at stake.

13   Here the Canton of Geneva is admittedly a political

14   subdivision.  And there a two classes within the Foreign

15   Sovereign Immunities Act:  The first is foreign states -- so

16   foreign states proper and political subdivisions -- and then

17   agencies or instrumentalities.  And the difference between

18   those two categories pervades the FSIA.  It's in the

19   definitional provision of 1603 and the punitive damages

20   provision of 1606.  Foreign states proper are not subject to

21   punitive damages, while agencies and instrumentalities are.  It

22   also differentiates between them in service of process as well

23   as execution.  So, here is another example where it treats the

24   foreign sovereign proper differently than it treats agencies or

25   instrumentalities.

J787ABAC

1        So, the first prong says you may exercise jurisdiction

2   if the property is present in the United States in connection

3   with the commercial activity of the foreign state.  That's a

4   very high bar.  And admittedly the property is not in the

5   United States, and so the first prong which applies to foreign

6   states absolutely does not apply.  And I think that is the

7   cleanest way to dismiss this case.

8        The second prong specifically refers to agencies or

9   instrumentalities.  It says if an agency or instrumentality

10   owns or operates that property wherever in the world, and they

11   conduct commercial activities in the United States, that's a

12   sufficient U.S. nexus.  And the reason those two are different

13   is because it's more delicate to exercise jurisdiction over the

14   foreign sovereign proper than it is necessarily for a company

15   that happens to be majority owned by a foreign state.

16        So, the juxtaposition between those two prongs has

17   been recognized time and again.  In the Second Circuit, Judge

18   Cabranes' decision in Garb spent quite some time

19   differentiating the two prongs and explaining that only the

20   first prong could be used to assert jurisdiction over a foreign

21   state or a political subdivision.

22        The most extensive explication that I am aware of is

23   the de Csepel case against Hungary in the D.C. Circuit.  But

24   even as recently as early this year the United States has in an

25   amicus brief to the Supreme Court in detail explained why only

J787ABAC

1    the first prong would apply to a foreign state.

2              Now, here, because the property is located in Geneva,

3    plaintiffs are forced to argue a novel interpretation, which is

4    that if the second prong could apply to some agency or

5    instrumentality, then those contacts must be imputed up to the

6    foreign state and perhaps every single agency or

7    instrumentality in every subdivision of the foreign state.  No

8    case has ever so held, for good reason.  It's contrary to the

9    text, structure and purpose of the Foreign Sovereign Immunities

10   Act, which treats the foreign state differently than agencies

11   or instrumentalities.

12             Finally, the agency or instrumentality that they focus

13   on here -- the Federal Office of Culture -- is not an agency or

14   instrumentality of Geneva.  So, even if their legal rule

15   applied, it wouldn't extend to Geneva.  So, it would extend to

16   perhaps Switzerland, the Swiss Confederation, but we are a

17   political subdivision, and therefore even under the legal

18   theory that they have brought for this case, it would not be

19   sufficient to assert jurisdiction over the Canton of Geneva.

20             THE COURT:  Thanks very much.

21             MR. JAFFE:  Good afternoon, your Honor.

22             THE COURT:  Good afternoon.

23             MR. JAFFE:  In assessing whether the Federal Office of

24   Culture or the customs administration is part of the central

25   government, or alternatively an agency or instrumentality, the

J787ABAC

1    Garb decision makes clear what you look at is -- you answer two

2    questions:  How are they formed and what is their purpose?

3            The "how is they formed" is reflected in two places:

4    Exhibit 3 to Mr. Becker's affidavit, where you have the Swiss

5    government announcing to the World Trade Organization the

6    structure of the central government.  And under the structure

7    of the central government you have both the Office of Culture

8    and you have the Customs Administration.  That's a declaration

9    to the world that those entities will be responding based upon

10   their central government status.  There are other tables, other

11   schedules that deal with agencies, instrumentalities, not the

12   central government.

13           Secondly, there is the Nussbaum affidavit.  Mr.

14   Nussbaum, who is with the Customs Administration and a Swiss

15   lawyer, testifies that, one, they are not separately

16   incorporated; they are parts of the departments under which

17   they are logged.  They do not have any independent existence

18   beyond the central government.  And, in addition to that, they

19   report to the executive of the central government.

20           THE COURT:  But why should I rely just on your

21   submissions as opposed to allowing jurisdictional discovery as

22   plaintiff requests?

23           MR. JAFFE:  A few reasons, your Honor.

24           First, if our evidence could be challenged, presumably

25   a Swiss lawyer or a Swiss law professor would have given an

J787ABAC

1    affidavit that says, no, no, no, Mr. Nussbaum got it wrong, Mr.

2    Nussbaum didn't give you the full story.  But these are

3    official publications of the Swiss government, the Becker

4    affidavit Exhibit 3.  Under our rules mere allegations are

5    trumped by affidavits under law.  And if there were a basis for

6    challenging them, first, the plaintiffs could have come forward

7    with an affidavit that says, no, no, no, no, they got it wrong,

8    they didn't tell you the whole story, there is more to it,

9    there is something else there.  But they didn't do any of that.

10   And these points were not made in a reply paper, they were made

11   in our opening papers, so they had plenty of opportunity to

12   address it.

13          Then when your Honor was good enough to allow them to

14   ask for jurisdictional discovery, there was no indication that

15   what they want to do is pursue Mr. Nussbaum's affidavit because

16   he was wrong, because there is a basis on which they could

17   challenge what he said.

18          When we in response said, where is your discovery

19   plan, how are you going to help the court identify the issues

20   and resolve the jurisdictional questions, their response was we

21   don't have one at this point, we don't have to have one at this

22   point, it touches all of the issues in this case.

23          Well, under the decisions that we cited in our papers

24   and which our colleagues on behalf of Geneva cited, it's not

25   enough simply to say we could do it, let us go after the

J787ABAC

1   foreign sovereign and take jurisdictional discovery.  Before

2   you can do that there has to be more than a prima facie

3   showing, more than simply a good faith allegation.  There needs

4   to be in the words of the Supreme Court in Boliviano, there

5   needs to be hard evidence that in fact there is subject matter

6   jurisdiction and then presumption that there is subject matter

7   jurisdiction, which is just the contrary of what we have here.

8        So, the answer to your Honor's question, if there was

9   something to it, the plaintiffs had more than an adequate

10  opportunity to address it.  They could have addressed it, as I

11  said before, with an affidavit from a Swiss law professor, from

12  a Swiss lawyer, from someone in a U.S. law school who is astute

13  about matters of Swiss law.

14       Secondly, when we said, where is your plan, who do you

15  want to take discovery from, how are you going to help the

16  court reach the right decision, their response was we don't

17  have one at this point but if we're allowed to take discovery

18  we will articulate it.  It seems to me that's putting the cart

19  before the horse.

20       Jurisdictional discovery is narrowly cabined in these

21  kinds of cases, and it requires a showing that in fact the

22  narrowly cabined discovery that you want to take will bear on

23  the issues that the court has to decide and will assist the

24  court in making that decision.

25       So, the first prong of the test -- are we dealing with

J787ABAC

1    agencies and instrumentalities, or are we dealing with parts of

2    the central government -- both the official pronunciations from

3    the Swiss federal government and the Nussbaum affidavit make

4    plain the facts set forth in those sworn papers trump the mere

5    allegations in the complaints and, frankly, the argument of

6    counsel.

7            As plaintiffs themselves somewhat ironically say in

8    their papers, the allegations or the arguments of Geneva's

9    counsel should not be taken at face because there are other

10    allegations.  It may be so that if it's allegation versus

11    allegation you're in equipoise, but when it's sworn testimony

12    versus allegation, you're no longer in equipoise.

13            The second prong of the test is that -- actually, One

14    other point, your Honor.  When it comes to the two federal

15    departments, with respect to Customs, what is the purpose of

16    Customs?  Enforce the tax laws, enforce the importation laws.

17    Plaintiffs make no argument at all that the Customs

18    Administration is anything but part of the central government.

19            When it comes to the Office of Culture, what they do

20    is they look at not the core functions that the Garb decision

21    requires, but they look at some peripheral activities.

22            We provided to the Court the mission statement of the

23    Office of Culture, and it says that "The Federal Office of

24    Culture is the strategic body responsible for drawing up and

25    implementing the Confederation's culture policy.  It's remit

J787ABAC

1    covers tasks that are strictly reserved to the Confederation,

2    namely improving the institutional framework, drafting

3    enactments in the culture sector, reviewing the compatibility

4    of enactments in other political areas, value added tax,

5    international free trade, vocational education, languages,

6    etcetera, with the needs of culture in coordination with the

7    Federal Department of Foreign Affairs, negotiating agreements

8    in the cultural sector."  And it goes on.

9            None of that is challenged.  There isn't an affidavit

10   that says, yeah, but there is more than that, that's not the

11   core, their mission statement got it wrong, under this piece of

12   legislation or that article there is more to it.  But there is

13   no challenge to that mission statement.  It is inconceivable

14   that one would say that's a mission statement that describes a

15   commercial activity.  It's just the opposite, it's expressly

16   carrying on the functions specifically reserved to the

17   Confederation.

18           When it comes to the Customs Administration, I've

19   already indicated there is no argument that they have any

20   commercial activity.  When it comes to culture, they point to

21   some peripheral activities, for example, publishing books.

22           To be sure, there are books on the Internet that one

23   can buy where the Office of Culture is listed as the editor,

24   but there are more than 7,000 books on the Internet that one

25   can buy produced by various departments of the United States

J787ABAC

1   government, including such treatises as Defense Department's

2   book Cookbook for Large Gatherings.  The fact that the Defense

3   Department published a book or 7,000 books on a myriad of

4   topics doesn't change it from being part of the central

5   government of the United States to an agency or instrumentality

6   of the United States.

7        When it comes to owned or operated -- which is the

8   second prong that has to be satisfied -- there is no argument

9   that the Customs Administration is owning or operating

10  anything.

11       So, it comes to the Office of Culture.  And what do

12  they say in that regard?  They start off by saying that the

13  Office of Culture is responsible for repatriating goods that

14  have been confiscated.  Secondly, the Office of Culture

15  cooperates with other parts of the Swiss government.  Perhaps

16  that's like the F.B.I. cooperating with the Department of

17  Commerce, or the CIA cooperating with the Department of State.

18  That doesn't make the CIA part of the State Department, and it

19  doesn't make the State Department part of the CIA.  And the

20  same could be true for any number of federal agencies that

21  cooperate one with the other.

22       They say that the Federal Office of Culture voiced its

23  suspicions to the Geneva prosecutor and that led to the

24  seizures about which they complain.  Again, under Swiss law

25  it's entirely appropriate if one part of the federal government

J787ABAC

1    sees a problem, for them to report it to the appropriate

2    authority.  Here the appropriate authority is outside of the

3    federal government, it's the Canton of Geneva and it's the

4    prosecutor in Geneva, and that's exactly what taking the

5    allegations of the complaint at face -- it's exactly what they

6    say happened.  That doesn't put the Office of Culture as making

7    them the owner or the operator of any of the artworks.

8         Lastly, they say that because you were there at the

9    commencement -- namely you the Office of Culture raised

10   suspicion -- and you will be there if the goods are ever

11   confiscated -- which is a step beyond the seizure -- you will

12   be responsible for repatriating, therefore you must be in

13   control in the middle.  That's exactly the opposite of what the

14   Nussbaum affidavit says; it's exactly the opposite of what the

15   statutory provisions that we've cited to your Honor say.

16        In fact, during the process, the Office of Culture,

17   the Customs Administration, have no control at all over the

18   decisions being made by the prosecutor in Geneva.  And as

19   counsel has already argued, those proceedings are in accordance

20   with and accepted values of international law.

21        The last point that I think we should make -- and I

22   guess -- does your Honor want to deal separately with the

23   jurisdictional discovery issue, or should we address that at

24   this point as well?

25        THE COURT:  Either way.  I mean you're welcome to

J787ABAC

1    address it now.

2          MR. JAFFE:  Well, I think the principal arguments as

3    to why jurisdictional discovery is not appropriate here are

4    twofold:  One, there is no showing of what it's going to be or

5    how it's going to help the court.  Two, when it comes to our

6    clients, we rely solely upon the public record, the statements

7    of the Swiss central government itself both in the World Trade

8    Organization and in the statutory sections that we've called to

9    the attention of the Court; and, secondly, upon the affidavit

10   of Mr. Nussbaum.

11         If we got it wrong, as I said before, it would have

12   been an easy matter to find a Swiss law professor, a Swiss

13   lawyer, a law professor here in the United States, to say they

14   got it wrong, they left something out.  We didn't hear any of

15   that.

16         Instead, what you have when it comes to ownership and

17   control, for example, are suspicions, suggestions, a long way

18   from any evidentiary proof that this court could establish.  It

19   doesn't even pass an Iqbal test.

20         So, with respect to jurisdictional discovery under the

21   arts decision that our colleague cited in one of the letters in

22   May back to the Court -- I think it was the May 15 letter --

23   you don't undertake jurisdictional discovery without their

24   being a firm foundation for the court to see its way to say,

25   yes, if you take this discovery it could make a difference.

J787ABAC

1          Here we have no idea what discovery they want to take,

2     much less how it could make a difference.  And they've had

3     plenty of opportunity to address the court through affidavits

4     of their own, which would be commonly done if in fact there

5     were a basis for challenging either the public pronouncements

6     or interpretation of them or challenging Mr. Nussbaum's

7     testimony.

8          THE COURT:  All right.  Thank you.

9          MR. JAFFE:  Two further comments, your Honor:  One

10    with respect to the act-of-state doctrine, and secondly with

11    respect to comity.

12         The very reason for those two doctrines is that it's

13    inappropriate for U.S. courts to inject itself into regular

14    proceedings in a foreign country.  There is no suggestion

15    here -- there is certainly no proof -- that the Swiss

16    government, the Canton of Geneva, are incapable of providing a

17    fair and equitable proceeding, that it would be futile for the

18    plaintiffs to pursue their rights in Switzerland.

19         But also importantly, the only basis upon which the

20    act-of-state doctrine is challenged is the second Hickenlooper

21    Amendment.  But as we point out in our papers, that amendment

22    doesn't apply because it only deals with property located in

23    the United States.

24         So, as a matter of comity to the Swiss proceedings, as

25    a matter of law with respect to the Hickenlooper Amendment,

J787ABAC

1  neither the act-of-state doctrine nor comity are ruled out, and

2  we think that both are applicable here as reasons why this

3  Court should stay it's hand, as well as the comments made by my

4  cocounsel on behalf of Geneva.

5          THE COURT:  Thank you.

6          Who would like to be heard on behalf of plaintiffs?

7          MR. AINSWORTH:  Your Honor, I didn't hear what you

8  said.

9          THE COURT:  Sorry?

10         MR. AINSWORTH:  I did not hear what you said.

11         THE COURT:  I said who would like to be heard on

12 behalf of plaintiffs.  I know it can be hard to hear, so I'm

13 going to remind everyone to speak into the mics, including me.

14         MR. AINSWORTH:  Kevin Ainsworth, your Honor.  And is

15 this volume sufficient?

16         THE COURT:  Yes.  Just bring the microphone a little

17 closer.  And I'm going to ask you to start where Mr. Anderson

18 started, which is whether you have any cases that you can cite

19 suggesting that a seizure of this sort constituted a taking in

20 violation of international law.

21         MR. AINSWORTH:  Your Honor, this is a unique

22 situation.

23         THE COURT:  Is it?  Why is it unique?

24         MR. AINSWORTH:  For one thing, international law

25 permeates everything that was done; and the nature of what was

J787ABAC

1    seized is unique in the cases.  Right?  So, if it weren't for

2    the UNESCO Convention there would be no seizure.  There was an

3    international agreement in 1970, the UNESCO Convention.

4    Switzerland signed on to it in the early 2000s and made it

5    effective in Switzerland in June of 2005, expressly not

6    retroactive.  And it's not like you can walk into a store or

7    warehouse and look at an antiquity and say, boy, that looks

8    like it might have been stolen.  It could be thousands of years

9    old.  It could be hundreds of years old.  You don't know where

10   it came from.  So to just look at something and say, boy, that

11   might have been stolen is ridiculous.

12          Switzerland, Geneva -- this was not seized with an

13   idea to return it to the neighbor and say this was stolen from

14   the store next door.  This was seized purportedly under the

15   implementing regulations -- implementing statute in

16   Switzerland, the Cultural Property Transfer Act, which

17   implemented the UNESCO Convention, for the purpose of

18   repatriating to another country.  No other country has laid

19   claim to this.  It's not like somebody said Mr. Hicham has got

20   our property.  The prosecutor walked in and said I'm seizing

21   all of this, some of it might have been stolen.  Right?

22          THE COURT:  But they're still investigating, right?

23          MR. AINSWORTH:  Are they?  That's what they say, your

24   Honor.  But let's take it from the beginning.

25          The Cultural Property Transfer Act, it's not

J787ABAC

1    retroactive, it doesn't apply to anything acquired before 2005.

2    Mr. Aboutaam inherited much of his collection from his father

3    in the '90s; he has collected things since then; it has been

4    stored in the warehouse there for decades.  So, there is a

5    question right off the bat whether there was any good faith

6    effort to determine the date of acquisition.

7         Under the Cultural Property Transfer Act there is no

8    illicit importation into Switzerland until Switzerland has a

9    bilateral agreement with another country.  The first of those

10   was 2008 with Italy.  There is only a handful of others.  So,

11   in order to look at something and say that was illicitly

12   imported, you have no know the country of origin and the date

13   of importation.  There is no evidence that any of this was

14   known.  It was just a purely arbitrary act.  They had suspicion

15   as to seven items, they seized 12,000.

16        THE COURT:  So let me step back.  So you're focusing

17   on what is arbitrary, as you did in your papers.  What's your

18   basis for even saying that an arbitrary seizure is a violation

19   of international law?

20        MR. AINSWORTH:  Your Honor, I want to thank counsel

21   for repeatedly pounding the Zappia case, because, by the way,

22   the court found that there was -- that the country at issue

23   there hadn't done any taking, so there was no jurisdiction, so

24   its discussion on the expropriation is dicta.  But it did cite

25   to the Congressional record as the source of its definition of

J787ABAC

1    taking, and it paraphrased, I will quote, the Congressional

2    record states:  "The term "taken in violation of international

3    law" would include the nationalization or expropriation of

4    property without payment of the prompt, adequate and effective

5    compensation required by international law.  It would also

6    include takings which are arbitrary or discriminatory in

7    nature."  So, that's the basis of Congress enacting the

8    expropriation exception, to cover arbitrary takings, with we

9    clearly have here.

10           THE COURT:  But again you don't have any cases in

11   which a court has said that law enforcement in a foreign

12   country acted arbitrarily in seizing someone's property.

13           MR. AINSWORTH:  I think if it's in our papers, your

14   Honor, we have it.  I can't think of one off the top of my

15   head.  It would have been in there.

16           What we've got is the U.S. juris prudence talking

17   about arbitrariness giving rise to constitutional rights.

18   Right?  An arbitrary action by the government gives right to

19   due process claims in the United States.  So, it's not like we

20   in the U.S. don't recognize that arbitrary actions give rise to

21   claims.

22           Defendants here are arguing they had no reason

23   whatsoever; they could seize the whole warehouse because they

24   wanted to and then investigate and that would be fine.  That's

25   not what the law is.  It says taken in violation of

J787ABAC

```
 1   international law, and that incorporates the arbitrariness.

 2              THE COURT:  Walk me through why this is a violation of

 3   international law.  Like actually walk me through what aspect

 4   of international law has been violated here.  Point me to

 5   specific provisions and walk me through it.

 6              MR. AINSWORTH:  Well, your Honor, there is the

 7   restatement that we cited in our brief.

 8              THE COURT:  I mean I think you talk about the CPTA,

 9   but the CPTA is Swiss law, right?

10              MR. AINSWORTH:  The CPTA --

11              THE COURT:  Even if the seizure did not comply with

12   the CPTA, that wouldn't constitute a violation of international

13   law because that's Swiss law, right?

14              MR. AINSWORTH:  The CPTA law is the implementing act.

15              THE COURT:  Right, so I'm just clarifying, that's

16   Swiss law, that's not international law.

17              MR. AINSWORTH:  That's Swiss federal law, that's

18   correct.

19              THE COURT:  Right.  So then you talk about the UNESCO

20   Convention, but it was unclear to me which provision you were

21   saying again had been violated.

22              MR. AINSWORTH:  Your Honor, the UNESCO Convention

23   talks about one country making a request to another for

24   repatriation.  There was no request by any country, so there is

25   no implementing or initiating action by another country under
```

J787ABAC

1    the UNESCO Convection.

2            THE COURT:  So where is the violation of the

3    international law?

4            MR. AINSWORTH:  It's the arbitrary taking of the

5    rights -- of the property, your Honor, as identified in the

6    House report.  An arbitrary taking is --

7            THE COURT:  And what support do you have that even

8    defines arbitrary in any way?  I mean here we have Swiss law

9    enforcement determining that there was a sufficient

10   justification for this seizure.  Point me to any support for

11   the notion that this was an arbitrary taking.

12           MR. AINSWORTH:  Your Honor, just refer to restatement

13   712.  "An act is unfair, unreasonable and inflicts serious

14   injury to establish rights of foreign nationals."  It's in

15   reporter's note we cite on page 8 of our memorandum, your

16   Honor.

17           THE COURT:  But you don't have anything else that can

18   provide any guidance as to what constitutes arbitrary

19   conduct -- or an arbitrary seizure.

20           MR. AINSWORTH:  I point out, your Honor, that the

21   defendants themselves conceded that at some point it will ripen

22   into a taking.  Right?  So, they want to say it's not

23   arbitrary.  It's not a taking now but --

24           THE COURT:  There is a difference between the taking.

25   I think the concession at least in the response to my question

J787ABAC

1  is when does something become a taking.  At a certain point

2  something becomes a taking.  But then there is a taking in

3  violation of international law, which is I understand your

4  position to be where it needs to be arbitrary.  Is that right?

5              MR. AINSWORTH:  Yes, your Honor.

6              THE COURT:  I am just asking for any support in the

7  law for the notion that this seizure was arbitrary in nature

8  and in violation of international law.

9              MR. AINSWORTH:  Your Honor, we've got, as I said, the

10  restatement, the House report, and the juris prudence we had

11  cited regarding arbitrary actions under the U.S. juris

12  prudence.  So due process violations, an arbitrary action by

13  police, can be challenged for violation of due process.

14             THE COURT:  Why haven't your clients engaged in the

15  appellate process available in Switzerland?

16             MR. AINSWORTH:  Your Honor, Mr. Hicham Aboutaam is a

17  U.S. citizen; he had written to the prosecutor there and the

18  authorities, and got answers basically demanding that he prove

19  he owned the property, reversing the burden of proof under the

20  UNESCO Convention, and decided that he was going to get better

21  treatment here, and he is entitled to file a lawsuit here under

22  the FSIA, so he wanted to seek that relief here, your Honor.

23             THE COURT:  How do you respond to defendants' reliance

24  on the Chettri case with respect to the taking?

25             MR. AINSWORTH:  Chettri there was evidence of

J787ABAC

wrongdoing, first of all.  It was a transfer between banks, and

one of the banks contacted the other and said they hadn't

received adequate documentation of the source of the funds that

had been wired, so they froze it.  So, that was clearcut

evidence of wrongdoing.  There was actually a later forfeiture

action brought and criminal action brought.

    What we didn't have is, as I say here, where you've

got a pitcher that could have originated from any country

around the world in the last thousand years and somebody said,

gee, I think that's suspicious, I think that was improperly

imported into the country.  And not only did Geneva did that

with regard to a pitcher, they did it with regard to 12,000

pieces, 5,000 of which they finally released last August after

the first lawsuit was filed.  That itself is an admission that

they had no basis to the 5,000.  So, they're still holding

7,000 total, 1200 of which are Mr. Aboutaam's.

    THE COURT:  Is there anything else you'd like to say

today?

    MR. AINSWORTH:  Yes, your Honor, there is quite a few

points that counsel made that need to be addressed.  First of

all, we didn't concede that they followed their procedure at

all.  That was in their papers and he said it today.  We have

not conceded that.  We have argued consistently that this was a

violation of, as your Honor pointed out, the Cultural Property

Transfer Act.

J787ABAC

1          Mr. Nussbaum in his opening affirmation or his only

2     affirmation did not discuss the core function of the Federal

3     Office of Culture, so their argument that we didn't respond to

4     it is specious.

5          And, in fact, your Honor, we provided to the Court as

6     Exhibit 21 to my declaration, which is document 46, the Federal

7     Office of Culture's annual report, and in there at page 70 it

8     shows a budget, your Honor, and the vast majority of their

9     budget is on commercial purposes.  It talks about subsidizing

10     film, heritage, schools, communicational language, museums,

11     promotional cultural organizations, awards.  So, we did provide

12     evidence to suggest that the Office of Culture's core function

13     is other than governmental.

14          THE COURT:  Even if I were to agree with you with

15     respect to FOC, tell me your argument as how I could retain

16     jurisdiction as to the other two defendants.

17          MR. AINSWORTH:  Your Honor, that's an interpretation

18     of the Section 1605.  And we cited the Cassirer decision of the

19     Ninth Circuit on this point.  1605(a) begins with a foreign

20     state shall not be immune when one of these subsections are

21     satisfied.  Subsection 3 is satisfied by the Foreign Office of

22     Culture, so the foreign state being Switzerland loses its

23     immunity as a result of the Office of Culture satisfying

24     subsection 3.

25          Geneva holds the property -- your Honor, Geneva acted

J787ABAC

 1    purportedly in connection with the federal statute here;

 2    they're implementing Swiss federal law, or claim to be.  At the

 3    peak of that pyramid is the Office of Culture.  The CPTA puts

 4    the Office of Culture responsible not only for initiating the

 5    actions and repatriating property but for storing the property

 6    in the meantime, storing seized property, so the Office of

 7    Culture is integral to the whole process.

 8         THE COURT:  With respect to the jurisdictional

 9    discovery that you're seeking regarding whether the FOC is an

10    agency or an instrumentality of the foreign state, what would

11    that discovery look like?

12         MR. AINSWORTH:  Your Honor, we imagine first we would

13    put up document requests and interrogatories.  Right?

14         THE COURT:  But what are you looking for?

15         MR. AINSWORTH:  Well, we have seen mandate from

16    Customs to an expert who was hired to evaluate some of this

17    material, to determine whether or not it meets any of the --

18    well, apparently to determine whether or not it meets any

19    repatriation requirements.

20         THE COURT:  But you could have hired an expert at this

21    point in time.  I mean what exactly are you going to seek in

22    jurisdictional discovery?  What are you asking for?

23         MR. AINSWORTH:  We've seen enough to show that there

24    is cooperation, coordination between the Office of Culture and

25    the Geneva prosecutor, is what I'm getting it, the mandate

J787ABAC

1    related to that.  If they want to argue that they're completely

2    independent, I think we've got enough evidence to show that

3    that's not true.  And if the Court needs to make a fact finding

4    on that, then we want to have discovery as to the degree of

5    coordination and cooperation and control by the Office of

6    Culture over this process.

7           THE COURT:  And do you know of any cases where

8    jurisdictional discovery of this sort has been ordered?

9           MR. AINSWORTH:  Your Honor, the case they cited

10   against discovery -- I need a second to find it -- in fact

11   ordered discovery.

12          THE COURT:  But I'm talking about where there is a

13   subdivision of a foreign government -- or jurisdictional

14   discovery on the question of whether a subdivision of a foreign

15   government is the foreign state itself or an agency or

16   instrumentality.  Do you have any cases where a court has

17   ordered jurisdictional discovery of that sort?

18          MR. AINSWORTH:  Your Honor, I don't recall off the top

19   of my head.  I would have to send that in if we have it.  But I

20   do point out, as I said, that we've presented evidence that the

21   Office of Culture's core function is commercial -- substantial

22   evidence.  So, I'm not even sure discovery is needed at this

23   point because their evidence is overweighed by ours.  But if

24   the Court felt that was not the case, then certainly there is a

25   fact finding to be done.  And there is Supreme Court authority

J787ABAC

1  and Second Circuit authority for the proposition of having

2  discovery to determine the facts relevant to jurisdiction.

3         Your Honor, if I may just have a moment to go over my

4  notes here.

5         THE COURT:  Sure.

6         MR. AINSWORTH:  Your Honor, the defendants cited not

7  only Chettri but Acadia and Amerisource, and the interesting

8  things about all of those cases is that there really was no

9  dispute as to the validity of the underlying investigation.

10  And that's not what is going on here.  Like I said, we can't

11  look at an antiquity and decide that looks suspicious.  There

12  is more to it than that.  And they seized a whole warehouse for

13  no reason.  It's an exercise, a flex of muscle, but it's

14  arbitrary.

15         Thank you, your Honor.

16         THE COURT:  All right.  Thank you.

17         Do you want to respond?

18         MR. MARMUR:  If I may for the plaintiffs Beierwaltes.

19         THE COURT:  Oh, yes, please.

20         MR. MARMUR:  And since we adopt the arguments of

21  Hicham Aboutaam, I'm not going to repeat those.  Some of them

22  may come up again, but I won't take more than a few minutes of

23  your time.

24         But I did think that it was important to highlight in

25  the context of the Beierwalteses why the actions here are both

J787ABAC

1    arbitrary and in violation of international law, which I think

2    are two of the issues that your Honor has focused on, and so

3    let me just paint the picture from the Beierwalteses'

4    perspective of what is going on here.

5              THE COURT:  Sure.

6              MR. MARMUR:  There are 18 pieces worth about $8

7    million that were consigned to Phoenix -- not Mr. Aboutaam but

8    Ali Aboutaam's company -- for the purpose of obtaining money to

9    repay certain creditors.  There has never been a single

10   question that they were bona fide purchasers of these items.

11   They bought them at auction.  They bought them -- and this is

12   alleged in the complaint -- with good provenance, that they

13   checked registries, they checked the UCC.  Never a question

14   that there was a problem with them.

15             Number two, those items were consigned to Phoenix in

16   2006, which is before Switzerland entered into a single

17   bilateral agreement with another country, meaning under both

18   UNESCO and as applied in Switzerland as adopted by the CPTA

19   there is no question that those pieces cannot violate the law

20   because the law says were they acquired after the adoption of a

21   bilateral agreement.  So, if they --

22             THE COURT:  Have you made those arguments been made in

23   Switzerland?

24             MR. MARMUR:  No.  And this is part of the problem,

25   your Honor, in terms of you asked what is the violation of

J787ABAC

1    international law.  UNESCO puts the burden on the country that

2    is taking the items to demonstrate that there is a problem and

3    to show that they need to be repatriated.  So, what they did

4    when we asked them to say, well, what is the problem here, they

5    turned it around on us; they said, well, show us your proof of

6    provenance, and we said, well, that's not how this works;

7    international law says you are supposed to establish that.

8          So, that is one of the answers to the question I think

9    you posed before, which is what is the violation of

10   international law.  It is shifting the burden of proof.  It's

11   like the analogy would be in our country is taking property

12   without a warrant as to at least my client's pieces and then

13   saying, well, give them back, they said, no, you tell us why

14   they're good.  That's not how it works, and it's not how it

15   works under UNESCO.

16         Now, having taken those pieces they kept them for two

17   and a half years without any request.  There is no articulable

18   suspicion as to any of the Beierwaltes pieces.  It was not the

19   one piece that originally was problematic or allegedly

20   problematic when it was discovered in a car.  It was not one of

21   only seven of 12,000 pieces that served as a basis for that

22   extraordinary seizure, and that's to a large extent the

23   Aboutaams'.  But it really is highlighted with respect to the

24   Beierwaltes, because none of that is problematic.

25         So, what that says is if a number of people consign to

J787ABAC

1    a dealer certain properties and they keep them in a warehouse,

2    if there is allegations that a few of those pieces as to a

3    certain consigner may be problematic, we are for every one of

4    those pieces are going to seize like 2,000 more of anybody else

5    in that warehouse.  That's like saying somebody complains about

6    a piece in the Metropolitan Museum of Art, we're going to seize

7    the entire first floor.

8             And that's not fair I don't think to them, but for my

9    clients it's certainly not fair where there has been no

10   articulable suspicion.  They continue to hold this.  There has

11   been no request for repatriation.  The facts are absolutely

12   clear that this was acquired -- or at least it's alleged and

13   there has never been a dispute that they have been acquired

14   before entering into any bilateral agreement.  They have now

15   kept them for two and a half years.  They have not told us why

16   there is a problem with it.  They have not compensated -- which

17   is the last part of the violation of international law.  If

18   you're going to take, you have to pay for it if eventually it's

19   repatriated.

20            So, to try to say, well, we haven't repatriated, we

21   are just keeping it, so we don't have to pay you, which can --

22   as I think your Honor was getting at -- last indefinitely.  And

23   while this isn't indefinite yet, there has been absolutely

24   nothing in those two and a half years to tell us why you have

25   our pieces.

1          So, at some point we should be able to come to a New

2     York court, a federal court in the United States, under the

3     FSIA, which provides a framework, and say, look, we are

4     entitled to our pieces back, or a declaration as to that; we're

5     not required to go to Switzerland.  That is, there is no

6     exhaustion requirement.  We can do it here as long as we meet

7     the statutory criteria.

8          And I want to just hit one other piece --

9     Mr. Ainsworth covered it well -- but this point about the FOC,

10    whether it has certain governmental missions -- which is what

11    they keep saying, there is a governmental mission statement --

12    is largely an irrelevancy.  It is not the purpose of the Act,

13    the Agency's Act.  It is whether an individual, a private

14    person, can engage in those acts.

15          For example, if New York City runs the Metropolitan

16    Museum of Art, then that may have a governmental purpose of

17    promoting the arts, but it is also something that an individual

18    can do.  An individual can promote the arts.  An individual can

19    open up a Swiss arts culture program in New York to promote

20    Swiss arts and Swiss language.  And I don't believe you

21    mentioned the Failla decision, the Barnett case from about two

22    weeks ago -- I can provide the cite to you.  It just came out,

23    so it was not in our papers.

24          THE COURT:  Why don't you.

25          MR. MARMUR:  Sure.  The cite that I have is a Lexis

J787ABAC

1    cite, and it's 2019 U.S. District Lexis 104313.  And if I could

2    just summarize the facts and the holding there.  And I am using

3    this case by analogy but to illustrate the distinction between

4    a governmental act and a commercial act.

5           What happened there was Sotheby's is having an

6    auction, Greece sends a letter and says, you know, one of these

7    pieces is stolen from Greece, you can't sell it, which of

8    course calls into question the provenance of the item, and an

9    auctioneer really can't sell it because it can't guarantee

10   clear title, so there is a declaratory judgment action brought

11   by the seller, the Barnetts, saying please declare this to be

12   valid.  And the question there arises under the FSIA was Greece

13   sending that letter a governmental or a commercial act.  And

14   Greece says, of course, well, look we're doing this because

15   it's our culture heritage, it's our property taken from our

16   soil, and we want it back, and that's part of our government

17   mission in Greece, to keep our pieces.  And the Barnetts say,

18   no, no, no, it doesn't matter, that's not the point, the point

19   is that you wrote a letter to an auction house that says give

20   us this piece back, it's ours.  That's something that anybody

21   can do.  Anybody can write a letter and say return our piece.

22   And Judge Failla says that's right, it's not the purpose, it's

23   not the mission that's important, it's whether a private person

24   can do it.

25           So, I have no doubt that the Federal Office of Culture

J787ABAC

of Switzerland has a mission, a governmental mission or purpose

to support the arts and culture of Switzerland, but what they

do, how they carried out that mission is something that for the

most part anybody can do.  And the question is which

predominates.

      And whereas I think both sides have put in some

evidence on that point, I believe we have the better of it when

you look at what they actually do.  But to that extent, if the

question is what is jurisdictional discovery going to get us,

on that question we can get more discovery to see whether it is

an instrument or whether it's an agency or instrumentality,

because I think that is more nuanced in terms of what

predominates, and we could find out who the people are who run

it, whether they do more governmental acts liken enacting or

proposing legislation or things that could be construed as

solely governmental.

      And just as a final point on that, they've made these

arguments -- defense made these arguments that, well, just

because the Department of Defense publishes a book, therefore,

you know, we're saying that they're an instrumentality of the

government as opposed to part of it.  That's not what we're

saying at all.

      There is no doubt that the Department of Defense has

an overwhelming government function and that private people

cannot build bombs and engage the military and carry out

J787ABAC

1   military operations.  So, that's clearly in that camp.  But the

2   whole point of this part of the statute is to recognize that

3   there are agencies and instrumentalities that don't fall into a

4   core governmental function like defense, or legislation, or

5   judicial activities, things that are uniquely reserved to the

6   government.  And on that point I believe we have the better of

7   it, but if not, I do suggest that jurisdictional discovery is

8   important.

9           So, I've wandered back into Mr. Ainsworth a little

10  bit, but I do want to stress that for my clients, the

11  Beierwalteses, there really is nothing that should prevent

12  Switzerland from returning these pieces.  As to them the

13  seizure is arbitrary.  As to them it is in violation of

14  international law because there was no articulable suspicion

15  for it.  They switched the burden on us; they've kept it; and

16  they haven't repatriated and they haven't compensated us for

17  it.

18          THE COURT:  Thank you very much.  That's helpful.

19          MR. AINSWORTH:  Your Honor, I wish I were as eloquent

20  as Mr. Marmur, and we certainly believe that the same arguments

21  apply to Mr. Aboutaam's pieces.  There were two points made

22  that I hadn't yet addressed, and I hope to briefly, and one is

23  the act of state and the other is comity.

24          Your Honor, on comity we had cited in our papers the

25  Simon v. Republic of Hungary case from the District of D.C.,

J787ABAC

1    and that case cited Republic of Argentina v. NML Capital, which

2    is a 2014 Supreme Court decision.

3            The Supreme Court decision said in a discovery context

4    it analyzed the scope of the FSIA and said that the FSIA was a

5    comprehensive replacement for the prior juris prudence of

6    jurisdiction, including comity.  And so the D.C. Circuit said

7    in light of the pronouncement by the Supreme Court in the NML

8    Capital case, there is no comity defense in FSIA cases anymore;

9    we look to the FSIA, and if we have jurisdiction we implement

10   it.

11           And it pointed out that foreign sovereigns are in a

12   unique situation in an FSIA case.  What they're basically

13   saying, the sovereign, is let us handle it, and then plaintiff

14   can come back to you.

15           A private party doesn't have that option, so the FSIA

16   says that the foreign sovereign should be liable like any other

17   private party.  But another private party doesn't have the

18   ability to say let us decide the issue.  A private party would

19   have to be subject to an independent court.  Here the sovereign

20   itself wants to decide the issue and send Mr. Aboutaam back

21   here.  And if he lost in Switzerland, they would argue then

22   that he is bound by res judicata here.  So this comity argument

23   is an end-run around the FSIA exception and shouldn't be

24   condoned.

25           On the act of state, your Honor, the Hickenlooper

J787ABAC

Amendment on its face is clear, the act-of-state doctrine does

not apply when there are takings in violation of international

law.

There is also a recent decision by the Second Circuit,

the plaintiffs' name is Kashef v. BNP Paribas from June 27,

2019.  The cite is 2019 U.S. App. Lexis 15120, and in part,

your Honor, that court held that the act-of-state doctrine

doesn't -- it only applies to official acts, and an act in

violation of the country's own law is not an official act.  And

here we pointed out that nothing that was done with regard to

plaintiffs' property was in conformance with the laws of

Switzerland.  It was in violation of their own law, and

therefore it can't be an official act and it can't be subject

to the act of state, your Honor.

THE COURT:  Thank you.

A brief response?

MR. ANDERSON:  I will limit it to three.

THE COURT:  Thank you.

MR. ANDERSON:  All the arguments that I just heard

counsel made should be made in Switzerland.  They are

complaining about following Swiss law and Swiss procedure.

They are complaining about whether there was reasonable

suspicion to attach assets.  It strikes me that this sounds

like a Rule 41(g) proceeding that we have in this court.  So

Criminal Rule 41(g) says that "a person aggrieved by an

J787ABAC

1    unlawful search and seizure of property, or by the deprivation

2    of property, may move for the property's return.  The motion

3    must be filed in the district where the property was seized."

4           It can't be that you can just skip the Rule 41(g)

5    procedure altogether or its equivalent in Switzerland and then

6    just sue somewhere else.  It would be like skipping a 41(g)

7    proceeding here and then going to Switzerland or Mongolia and

8    saying that the United States has taken my property in

9    violation of international law.  Whether the Geneva prosecutor

10   complied with Swiss law, that should be determined in

11   Switzerland.

12          And we talked about the delay.  We just heard counsel

13   say that they have refused to participate in helping the Geneva

14   prosecutor and the investigators in the criminal proceeding in

15   Switzerland identify the provenance and other aspects of these

16   antiquities.  These why this has taken time.  The prosecutor

17   has released by their own admission almost half of the

18   antiquities that were initially seized.

19          THE COURT:  Do you have any support for the

20   proposition that there is essentially an exhaustion

21   requirement, that there is a requirement that they participate

22   in Switzerland?

23          MR. ANDERSON:  So, there are three branches of comity

24   or flavors of comity that we raise, so I will focus directly on

25   the exhaustion.  They mentioned the Simon case from the D.C.

J787ABAC

Circuit.  It's contrary to the Seventh Circuit's decision in

Fisher.  The United States after the Simon decision came down

in the D.C. Circuit told the D.C. Circuit it's wrong.  Both of

the defendants in Simon and Philip -- there are two companion

cases -- are seeking cert to the U.S. Supreme Court right now.

So, for all of those reasons Simon does say what they say, but

the Seventh Circuit has held that there is an exhaustion

requirement.  And it's not baked into the Foreign Sovereign

Immunities Act, but it's an aspect of international comity.

        And to further the good relations between countries,

we should allow the foreign sovereign the opportunity to hear

the exact arguments you just heard.  The foreign sovereign's

courts are more capable of addressing whether in fact there was

reasonable suspicion under the circumstances that Swiss law may

require.  They are more appropriate to determine whether a

Swiss prosecutor complied with Swiss law.

        Many of the factual debates that plaintiffs have

addressed today are more challenging because we are 3,860 miles

away from Geneva today.  The Swiss courts again are the

appropriate forum for that.

        Second are the cases that they mention.  We have

talked about Simon, and they raise the Cassirer case from the

Ninth Circuit.  As we explained in our brief, the Cassirer case

in the Ninth Circuit never addressed the two nexus prongs.  It

was assumed throughout the litigation that Spain never made an

J787ABAC

1    argument that it had an independent right not to be in the

2    case.  After the Ninth Circuit decided the Cassirer case, Spain

3    sought cert to the U.S. Supreme Court.  The United States brief

4    in support of Spain explained that that issue was never

5    addressed, and in fact Cassirer conceded to the United States

6    that Spain should be dismissed from the case because they could

7    not satisfy the first nexus prong.  And that issue had just

8    been missed throughout the litigation.  When that case came

9    back from the Supreme Court, in fact they did dismiss Spain

10   from the case.  And that's docket entry 119.

11            So, the case they rely on never addressed the issue.

12   And when it was you brought to their attention, they released

13   the sovereign from the case, just as we're asking your Honor to

14   do here.

15            Finally, the other issue was the act-of-state

16   doctrine.  I believe counsel just said that if the foreign

17   sovereign is alleged to have violated their own law, it can't

18   constitute an act of state.  That's exactly what the

19   act-of-state doctrine is designed to preclude.  In fact, U.S.

20   courts are not supposed to sit in judgment of the legality or

21   illegality of sovereign acts taken by a foreign government

22   within their own territory.  That's the entire point of the

23   doctrine.  They are assumed to be valid if taken within their

24   own territory.

25            And this is an issue of separation of powers.  The

J787ABAC

1    Executive branch is uniquely charged to determine whether a

2    foreign sovereign is complying with its own laws.  It's not for

3    the Judicial branch to make that determination.  So, again, I

4    respectfully submit that that was not a correct articulation of

5    the act-of-state doctrine, and in fact it precludes this Court

6    from making exactly the determination that was just asked.

7              Finally, both with respect to the legal issues and the

8    jurisdictional discovery that was requested, I think it's

9    important to keep in mind the practical effect and consequences

10   here.

11             The aggregate effect of the legal arguments that

12   counsel for the plaintiffs is making is that this court would

13   have jurisdiction over any act in exercise of a foreign

14   government's police powers if plaintiffs can allege that it

15   violated local procedures or was arbitrary, and that loss of

16   immunity would extend to every aspect of the foreign state.

17   That takes the immunity scalpel of the Foreign Sovereign

18   Immunities Act and transforms it into a sledgehammer.

19             And we need to remember that immunity is a reciprocal

20   enterprise.  The immunity that we afford to foreign sovereigns

21   in this country is the same immunity that the United States

22   enjoys abroad.  And with respect to jurisdictional discovery,

23   practical considerations highlight why the court should act

24   with great restraint before going down that road.

25             They're asking for discovery from a foreign prosecutor

J787ABAC

1    to justify whether he acted arbitrarily in the midst of an

2    ongoing investigation.  It's not clear what the end game is

3    here.  Is it to enjoin a foreign criminal prosecutor from

4    engaging in that investigation?  Are we going to declare the

5    property rights of property, hundreds or thousands of pieces

6    that are located halfway around the world?  They've already

7    dropped claims relating to a number of the pieces of property

8    here, and yet the complaint still asks for $90 million of

9    compensation for assets that have not been taken.

10        These are again just the practical considerations of

11   why the Court should rightly exercise great hesitation both

12   before exercising jurisdiction but even ordering jurisdictional

13   discovery from any of the defendants here.

14        Immunity is not just immunity from liability; it's

15   immunity from the attendant burdens of litigation, and that

16   extends to discovery as the cases that we cited in our letter

17   describe.

18        If the Court has no further questions ...

19        THE COURT:  That's it.

20        All right.  Thank you all.  This was very well briefed

21   and argued.  I will reserve decision, but thanks.  Have a nice

22   afternoon.

23        (Decision reserved)

24

25