19-3457, 19-3481
*Beierwaltes; Aboutaam v. L'Office fédérale de la culture de la Confederation Suisse*

# United States Court of Appeals
# For the Second Circuit

---

August Term 2020

Argued:  October 20, 2020
Decided:  June 8, 2021

Nos. 19-3457, 19-3481

---

LYNDA BEIERWALTES, WILLIAM BEIERWALTES,

*Plaintiffs-Appellants,*

*v.*

L'OFFICE FEDERALE DE LA CULTURE DE LA
CONFEDERATION SUISSE (FEDERAL OFFICE OF
CULTURE OF THE SWISS CONFEDERATION),
L'ADMINISTRATION FEDERALE DES DOUANES
DE LA CONFEDERATION SUISSE (FEDERAL
CUSTOMS ADMINISTRATION OF THE SWISS
CONFEDERATION), LA REPUBLIQUE ET
CANTON DE GENEVE (REPUBLIC AND
CANTON OF GENEVA),

*Defendants-Appellees.*

---

HICHAM ABOUTAAM,

*Plaintiff-Appellant,*

*v.*

L'OFFICE FEDERALE DE LA CULTURE DE LA
CONFEDERATION SUISSE (FEDERAL OFFICE OF
CULTURE OF THE SWISS CONFEDERATION),
L'ADMINISTRATION FEDERALE DES DOUANES
DE LA CONFEDERATION SUISSE (FEDERAL
CUSTOMS ADMINISTRATION OF THE SWISS
CONFEDERATION), LA REPUBLIQUE ET
CANTON DE GENEVE (REPUBLIC AND
CANTON OF GENEVA),

*Defendants-Appellees.*[*]

---

Appeals from the United States District Court
for the Southern District of New York
Nos. 18-cv-8248, 18-cv-11167,
Ronnie Abrams, *Judge*.

---

Before:      RAGGI, SULLIVAN, and MENASHI, *Circuit Judges*.

In 2017, Swiss law enforcement officers seized more than a thousand pieces of ancient art owned by the plaintiffs as part of an ongoing investigation into illegal trafficking of cultural property in Switzerland.  The plaintiffs sued the defendant Swiss government entities and instrumentalities in the Southern District of New York, alleging that the seizure was arbitrary and made without probable cause.  The district court (Abrams, *J.*) dismissed the cases, holding that it lacked jurisdiction over the defendants under the Foreign Sovereign Immunities Act.  The plaintiffs now appeal, arguing that jurisdiction is proper under the statute's "expropriation exception," which applies in cases involving property taken by a foreign state in violation of international law.  *See* 28 U.S.C. § 1605(a)(3). We disagree and AFFIRM the district court.

---

[*] The Clerk of Court is directed to amend the captions for both cases as set forth above.

1    A routine law enforcement seizure does not ordinarily constitute a taking at
2    all, let alone a taking in violation of international law, because it falls within a
3    state's traditional police powers.   And while there are a handful of narrow
4    exceptions to that general rule, such as when the seizure (i) is not rationally related
5    to a public purpose, (ii) is a pretextual attempt to nationalize property without
6    compensation, or (iii) has continued for an unreasonable amount of time, none of
7    those exceptions applies here.   Accordingly, the seizure was not a taking in
8    violation of international law, and the Foreign Sovereign Immunities Act therefore
9    does not vest the district court with jurisdiction.
10
11    AFFIRMED.
12
13                                    ANJU UCHIMA (William G. Pearlstein, *on the*
14                                    *brief*), Pearlstein & McCullough LLP, New
15                                    York, NY, *for Plaintiffs-Appellants Lynda*
16                                    *Beierwaltes, William Beierwaltes, and Hicham*
17                                    *Aboutaam.*
18
19                                    ROBERT REEVES ANDERSON (Marcus A. Asner,
20                                    Arnold & Porter Kaye Scholer LLP, New York,
21                                    NY; Janine M. Lopez, Arnold & Porter Kaye
22                                    Scholer LLP, Washington, DC, *on the brief*),
23                                    Arnold & Porter Kaye Scholer LLP, Denver,
24                                    CO, *for Defendant-Appellee La République et*
25                                    *Canton de Genève.*
26
27                                    MICHAEL EVAN JAFFE (Stephan E. Becker, *on the*
28                                    *brief*), Pillsbury Winthrop Shaw Pittman LLP,
29                                    Washington, DC, *for Defendants-Appellees*
30                                    *L'Office Federale De La Culture De La*
31                                    *Confederation Suisse and L'Administration*
32                                    *Federale Des Douanes De La Confederation Suisse.*
33
34    RICHARD J. SULLIVAN, *Circuit Judge*:

35    Foreign governments and their instrumentalities are ordinarily immune

3

1  from suit in American courts under the Foreign Sovereign Immunities Act,

2  28 U.S.C. § 1602, *et seq.* (the "FSIA").   There are, however, several statutory

3  exceptions to that general rule.   One of those exceptions is the "expropriation

4  exception," which may be invoked in certain cases involving property taken by a

5  foreign government or its instrumentality in violation of international law.  *See id.*

6  § 1605(a)(3).

7     The question before us is whether that exception applies to property that

8  was seized as part of an ongoing law enforcement investigation.   We hold that

9  such seizures ordinarily do not constitute a taking at all, much less a taking in

10  violation of international law.   And while there are a handful of narrow

11  circumstances in which a seizure can fall within the scope of the expropriation

12  exception, none applies to this case.  Accordingly, we AFFIRM the judgment of the

13  district court (Abrams, *J.*)

## I.    Background

14

### A.    Facts

15

16     Lynda and William Beierwaltes are art collectors who are citizens and

17  residents of Colorado.  During the 1990s, the Beierwalteses assembled one of the

18  world's leading private collections of ancient art.  By the early-aughts, the couple

found themselves in severe financial straits.  So, in 2006, they engaged an art gallery based in Geneva, Switzerland – Phoenix Ancient Art S.A. ("Phoenix") – to help them sell their collection.

Phoenix was founded in 1998 by Hicham Aboutaam (together with the Beierwalteses, the "Art Owners") and his brother, Ali Aboutaam.  Since then, Ali has overseen Phoenix's day-to-day operations, while Hicham has managed an affiliated gallery based in New York, where he is a citizen and resident.  Over time, Hicham himself has acquired a large personal collection of antiquities, many pieces of which are stored with or consigned for sale to Phoenix in Geneva.

In December 2016, a border patrol officer for the Federal Customs Administration of the Swiss Confederation (the "Swiss Customs Administration") stopped a Land Rover registered to Phoenix that was entering the country across the French border.[1]  During a routine inspection of the SUV, the officer identified what appeared to be an illegally imported antique oil lamp along with receipts for a storage warehouse in Geneva.  The driver and passenger were questioned and eventually released around 2:00 AM the following morning.  At about the same

---

[1] The Swiss Federal Customs Administration, officially titled L'Administration Federale Des Douanes De La Confederation Suisse, plays a role similar to the U.S. Customs and Border Protection Agency.

5

1   time, surveillance footage of the storage warehouse listed on those receipts

2   captured what appeared to be Ali's wife, Biljana Aboutaam, participating in

3   "several movements of merchandise."  Aboutaam App'x at 56.

4        Based on this information, the Swiss Customs Administration developed a

5   "strong suspicion" that the warehouse was being used to store numerous pieces

6   of illegally imported art and antiquities.  *Id.*  Thereafter, on February 10, 2017, the

7   Swiss Customs Administration issued a "denunciation," asserting that Biljana and

8   others were involved in the "sudden and suspicious move[ment] . . . of a number

9   of articles of cultural property."  *Id.* at 39.  This denunciation was similar to one

10  that had been prepared the prior month by the Swiss Federal Office of Culture

11  (together with the Swiss Customs Administration, the "Swiss Agencies").[2]  That

12  earlier denunciation had identified "seven objects of suspicious provenance or

13  origin" held by Inanna Art Services S.A., a company affiliated with, and that leased

14  warehouse space from, Phoenix.  *Id.*

15       On February 24, 2017, based on those two denunciations, the Public

16  Prosecutor's Office of the Republic and Canton of Geneva issued a search and

---

[2] The primary purpose of the Swiss Federal Office of Culture, the formal title of which is L'Office Federale De La Culture De La Confederation Suisse, is to promote and preserve Swiss culture and heritage.

1    seizure order, naming as defendants Ali, Biljana, Inanna Art Services, and others

2    (though neither the Beierwalteses nor Hicham).[3]  The order explained that the

3    defendants were "suspected . . . of receiving stolen goods" and of illegally

4    trafficking in cultural property.  *Id.*  As a result, it authorized the seizure of relevant

5    objects and documents found in various storage locations used by Inanna Art

6    Services, Ali, and Ali's companies, including Phoenix.   Pursuant to that

7    authorization, Swiss authorities seized nearly 12,000 antiquities.   Rather than

8    physically remove the objects, however, authorities simply "segregated [them] in

9    place."  Beierwaltes Br. at 11 n.9.  Of those 12,000 artifacts, approximately 1,200

10   belonged to Hicham and another 18 to the Beierwalteses.   The seizure order

11   informed the named defendants that they could appeal the order to "the criminal

12   board of appeals of the Court of justice" in Geneva.  Aboutaam App'x at 41.

13        Days later, the Swiss Customs Administration issued a separate search

14   warrant as part of a "criminal customs inquiry" into potential violations of Swiss

15   law, including evasion of Swiss import taxes.  *Id.* at 56.  Pursuant to that warrant,

16   111 additional artifacts were seized from Ali's and Biljana's Geneva home, at least

17   one of which belonged to the Beierwalteses.  Similar to the Geneva prosecutor, the

---

[3] The Swiss structure of government resembles that of the United States, with cantons filling the role of states.

7

1    Swiss Customs Administration permitted the seized items to remain with Ali and

2    Biljana, and simply "prohibited [the couple] from disposing of them." *Id.* at 57.

3    And, like the Geneva search warrant, the Swiss Customs Administration's warrant

4    made clear that the seizure could be challenged through domestic legal

5    proceedings.[4]

6         Over a year later, on May 7, 2018, the Art Owners sent letters to the Geneva

7    prosecutor to demand the immediate release of their property.  Within days, the

8    prosecutor's office responded with a letter of its own explaining that the seized

9    property was suspected of being related to criminal activity and that expert

10   analysis was underway to determine whether any of the objects had been

11   imported in violation of Swiss law.  To help speed up that process, however, the

12   prosecutor offered the Art Owners the chance to submit documents concerning

13   the art's chain of title.  Like the warrants, the prosecutor's letter again noted that

14   the Art Owners could appeal to the Geneva criminal court.

15        Rather than provide the referenced documents or seek relief in Swiss court,

---

[4] The Swiss Agencies insist that the Swiss Customs Administration's investigation is independent and separate from the investigation being conducted by the Geneva prosecutor's office.  The Art Owners, by contrast, appear to treat all these actions as part of a single investigation that is being overseen by the Geneva prosecutor's office with the aid of the Swiss Agencies.  The choice between these formulations has no impact on our decision.  Without deciding the issue, we adopt the Art Owners' approach and refer to these actions as part of a single investigation.

1    the Art Owners reiterated their belief that there was no legal basis for the seizure

2    and that their property should be returned.  In each case, the prosecutor's office

3    refused and indicated that the investigation was ongoing.  The Beierwalteses sent

4    a similar letter to the Swiss Customs Administration, which, like the Geneva

5    prosecutor, responded that its investigation would proceed but that the

6    Beierwalteses were free to provide documentation to help establish their legal

7    ownership of the seized artifacts.

8           On August 8, 2018 – the same day the Beierwaltes filed their civil complaint

9    in the U.S. District Court for the District of Colorado – the Geneva prosecutor

10   released around 5,000 of the 12,000 objects that it had seized.  Then, in April 2019,

11   the Swiss Customs Administration requested additional information from the Art

12   Owners about several items, and later released over one hundred items, six of

13   them Hicham's.

14          Three sets of Swiss laws are relevant to that investigation.  The first are Swiss

15   customs laws.  Nearly all articles imported into Switzerland must be declared for

16   assessment of customs duties and value added tax.  *See* Customs Act [CA] Mar. 18,

17   2005, SR 631.0, art. 25 (Switz.); Federal Act on Value Added Tax [VAT Act] June

18   12, 2009, SR 641.20 (Switz.).  The Swiss Customs Administration is empowered to

1    prosecute individuals suspected of evading those obligations.

2        The second are Swiss laws governing trade in cultural property.  The seeds

3    for those laws were first planted in 1975, when Switzerland ratified the United

4    Nations  Educational,  Scientific  and  Cultural  Organization  ("UNESCO")  1970

5    Convention on the Means of Prohibiting and Preventing the Illicit Import, Export

6    and Transfer of Ownership of Cultural Property, 823 U.N.T.S. 231 (1972), a multi-

7    lateral treaty designed to tackle the growing problem of trafficking in stolen art

8    and antiquities.  Among other things, the UNESCO Convention required member

9    nations to "take appropriate steps to recover and return" stolen cultural property

10   "at the request of the [country] of origin."  *Id.* art. 7.  But, as the Convention was

11   not self-executing, it had very little immediate effect.

12       In  June  2003,  however,  Switzerland  enacted  domestic  legislation  to

13   implement the Convention.  That legislation, the Federal Act on the International

14   Transfer of Cultural Property (the "CPTA"), formally criminalized the intentional

15   importation, sale, distribution, procurement, or exportation of cultural property

16   that was "stolen or otherwise lost against the will of the owner."  Federal Act on

17   the International Transfer of Cultural Property [CPTA] June 20, 2003, art. 24

1   (Switz.).[5]  While several different divisions of the Swiss government can enforce

2   its provisions, the Swiss cantons, including Geneva, have primary responsibility

3   for investigating and prosecuting criminal conduct under the CPTA.  *See id.* art.

4   27.  The CPTA also authorizes the Swiss Federal Office of Culture to monitor art

5   dealers' compliance with the statute's terms.[6]

6        The last set of relevant Swiss laws concerns the nation's general prohibition

7   on the knowing possession of stolen goods.  Specifically, Article 160 of the Swiss

8   Criminal Code makes it unlawful for any person to "take[] possession of . . . goods

9   which he knows or must assume have been acquired by way of an offence against

10  property."  Swiss Criminal Code Dec. 21, 1937, SR 311, art. 160 (Switz.).  Naturally,

11  this provision is often implicated in cases involving CPTA violations.

12  **B.   Procedural History**

13       In early August 2018, the Beierwalteses sued the Swiss Agencies and

14  Geneva in the District of Colorado, seeking a declaratory judgment as to their title

15  to the seized artifacts, along with common law claims for conversion, unjust

---

[5] The CPTA is sometimes referred to as the "LTBC," as the statute's native name is "Loi fédérale sur le transfert international des biens culturels."

[6] Notably, the 5,000 objects released by the prosecutor's office on August 8, 2018 had been notarized on Phoenix's registry as pre-CPTA imports (*i.e.*, objects imported before the law's June 1, 2005 effective date).

1    enrichment, and civil theft.  The following month, Hicham filed a similar

2    complaint in the Southern District of New York.  The Beierwalteses' case was

3    thereafter transferred on consent to New York as related to Hicham's.

4    On September 24, 2019, the district court dismissed both cases in a single

5    decision.  *See generally Aboutaam v. L'Office federale de la culture de la Confederation

6    Suisse*, Nos. 18-cv-8248, 18-cv-11167 (RA), 2019 WL 4640083 (S.D.N.Y. Sept. 24,

7    2019).  The district court reasoned that the Swiss Agencies and Geneva were

8    immune from suit under the FSIA.  And while the statute includes an exception

9    for cases involving property taken in violation of international law – known as the

10   "expropriation exception" – the district court determined that the Art Owners'

11   property had been legally seized incident to a valid law enforcement investigation.

12   *See id.* at *2–5.  The district court also denied the Art Owners' request for

13   jurisdictional discovery.  *See id.* at *5.

14   The Art Owners each timely appealed the judgment.  Because the facts and

15   issues raised across the appeals are nearly identical, the appeals were argued in

16   tandem, and we now resolve them in a single opinion.

17   **II.    Burden of Proof & Standard of Review**

18   A defendant seeking to invoke the FSIA's protections must make a *prima*

12

1 *facie* showing that it is a foreign sovereign. *See Rukoro v. Federal Republic of Germany*,

2 976 F.3d 218, 224 (2d Cir. 2020). If the defendant is successful in doing so, the

3 plaintiff bears the burden of demonstrating that an exception to foreign sovereign

4 immunity applies. *See id.* "Once the plaintiff has met its initial burden of

5 production, the defendant bears the burden of proving, by a preponderance of the

6 evidence, that the alleged exception does not apply." *Id.* (quoting *Pablo Star Ltd. v.*

7 *Welsh Gov't*, 961 F.3d 555, 560 (2d Cir. 2020)).

8      Still, a plaintiff seeking to drag a foreign government into court has her work

9 cut out for her. *See Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling*

10 *Co.*, 137 S. Ct. 1312, 1316 (2017) ("[A] party's nonfrivolous, but ultimately incorrect,

11 argument that property was taken in violation of international law is insufficient

12 to confer jurisdiction. Rather, state and federal courts can maintain jurisdiction to

13 hear the merits of a case only if they find that the property in which the party

14 claims to hold rights was indeed 'property taken in violation of international

15 law.'"); *Rukoro*, 976 F.3d at 224–25. And since the "basic objective" of sovereign

16 immunity is "to free . . . foreign sovereign[s] from *suit*," *Helmerich & Payne*, 137 S.

17 Ct. at 1317, this gesture of comity aims to shield them from the "expense,

18 intrusiveness, and hassle of litigation" altogether, *Arch Trading Corp. v. Republic of*

13

*Ecuador*, 839 F.3d 193, 206 (2d Cir. 2016) (internal quotation marks omitted); *see also*

*Dole Food Co. v. Patrickson*, 538 U.S. 468, 479 (2003) (recognizing that sovereign

immunity is meant "to give foreign states and their instrumentalities some

protection from the inconvenience of suit"); *Cargill Int'l S.A. v. M/T Pavel Dybenko*,

991 F.2d 1012, 1016 (2d Cir. 1993).  Consequently, courts must endeavor to resolve

questions of foreign sovereign immunity "as near to the outset of the case as is

reasonably possible," even if that requires deciding disputed factual issues.

*Helmerich & Payne*, 137 S. Ct. at 1317; *see also Rukoro*, 976 F.3d at 224–25.

On appeal following a dismissal under the FSIA, "we review the district

court's legal conclusions concerning sovereign immunity *de novo* and its factual

findings for clear error."  *Arch Trading*, 839 F.3d at 199 (internal quotation marks

and brackets omitted).  Our review of a district court's decision to deny

jurisdictional discovery is even more deferential.  We assess such rulings only for

abuse of discretion, "mindful that a district court has wide latitude to determine

the scope of discovery."  *Id.* at 206 (internal quotation marks omitted).

14

1               **III.    Discussion**

2   **A.    The Foreign Sovereign Immunities Act**

3            The principles of sovereign immunity, comity, and international reciprocity

4   are "deeply rooted" in our nation's laws and history. *Garb v. Republic of Poland*,

5   440 F.3d 579, 585 (2d Cir. 2006); *see also Helmerich & Payne*, 137 S. Ct. at 1319. Chief

6   Justice Marshall first crystalized those concepts in *The Schooner Exchange v.*

7   *McFaddon*, 11 U.S. (7 Cranch) 116 (1812), when he explained that although "foreign

8   sovereigns do not enjoy an inherent right to be held immune from suit in American

9   courts," *Opati v. Republic of Sudan*, 140 S. Ct. 1601, 1605 (2020), "the United States

10   ha[s] impliedly waived jurisdiction over certain activities of foreign sovereigns . . .

11   [a]s a matter of grace and comity," *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S.

12   480, 486 (1983).

13            From that case sprang a doctrine of virtually "absolute sovereign immunity"

14   that exempted foreign governments from all manner of suits in our nation's courts

15   for the next century and a half. *See Garb*, 440 F.3d at 585; *see also Permanent Mission*

16   *of India to the United Nations v. City of New York*, 551 U.S. 193, 199 (2007). But that

17   doctrine was effectively controlled by the Executive Branch, not the Judiciary. *See*

18   *Verlinden*, 461 U.S. at 486–87; *see also Mobil Cerro Negro, Ltd. v. Bolivarian Republic of*

1    *Venezuela*, 863 F.3d 96, 103 (2d Cir. 2017).  In practice, sovereign immunity was

2    invoked by the State Department whenever it submitted a "suggestion[] of

3    immunity," something it did in nearly every action brought against a foreign

4    sovereign.  *Verlinden*, 461 U.S. at 486–87; *see also Opati*, 140 S. Ct. 1605; *Rubin v.*

5    *Islamic Republic of Iran*, 138 S. Ct. 816, 821 (2018).  Once a suggestion of immunity

6    was made, the reviewing court would typically defer to the State Department on

7    the theory that issues of comity and foreign relations "implicate[] judgments [that]

8    the Constitution reserves to the political branches."  *Opati*, 140 S. Ct. at 1605.  And

9    so it went until the middle of the twentieth century, when "this arrangement

10   [finally] began to break down."  *Id.*

11        In 1952, in what has been dubbed the "Tate Letter," the State Department

12   changed course and enunciated "a new, 'restrictive' theory of sovereign

13   immunity."[7]   *Garb*, 440 F.3d at 585.  Under that theory, sovereign immunity

14   continued to be recognized where "public acts" were concerned but was no longer

15   extended in "cases arising out of a foreign state's strictly commercial acts."

16   *Verlinden*, 461 U.S. at 487; *see also Garb*, 440 F.3d at 585.

---

[7] The Tate Letter is available as an appendix to the Supreme Court's decision in *Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 711–715 (1976) (Appendix 2); *see also* Letter of Jack B. Tate, Acting Legal Adviser, Dep't of State, to Acting Att'y Gen. Philip B. Perlman (May 19, 1952), *reprinted in* 26 Dep't of State Bull. 984, 984–85 (1952).

1    Unfortunately, application of this approach "proved troublesome."

2    *Verlinden*, 461 U.S. at 487.  As in the past, foreign nations often exerted diplomatic

3    pressure on the State Department to recognize their immunity even in cases

4    involving commercial acts.  *See id.*; *see also Republic of Argentina v. NML Cap., Ltd.*,

5    573 U.S. 134, 141 (2014).  In other cases, foreign nations failed to seek Executive

6    Branch intervention altogether, thrusting courts into the difficult position of

7    deciding whether immunity was appropriate based largely on analogy to prior

8    State Department decisions.  *See NML Cap.*, 573 U.S. at 141; *Mobil Cerro Negro*, 863

9    F.3d at 103–04.

10    For nearly 150 years, then, the standards governing foreign sovereign

11    immunity "were neither clear nor uniformly applied," and were subject to the ad

12    hoc decisions of Executive Branch officials.  *NML Cap.*, 573 U.S. at 141 (internal

13    quotation marks omitted).  But all that changed in 1976, when Congress "abated

14    the bedlam" by passing the FSIA.  *Id.*  In the FSIA, Congress set forth "a

15    comprehensive set of legal standards governing claims of immunity in every civil

16    action against a foreign state or its political subdivisions, agencies[,] or

17    instrumentalities" *Verlinden*, 461 U.S. at 488, and vested sole responsibility for

17

1  applying those standards in the federal judiciary, *see Mobil Cerro Negro*, 863 F.3d at

2  104 (citing 28 U.S.C. § 1602).

3  The FSIA begins with the baseline presumption that foreign states are

4  "immune from the jurisdiction of United States courts." *Chettri v. Nepal Rastra*

5  *Bank*, 834 F.3d 50, 55 (2d Cir. 2016) (quoting *Saudi Arabia v. Nelson*, 507 U.S. 349,

6  355 (1993)); *see also Federal Republic of Germany v. Philipp*, 141 S. Ct. 703, 709 (2021)

7  (citing 28 U.S.C. § 1604). But the law also includes several exceptions. *See Zappia*

8  *Middle E. Constr. Co. v. Emirate of Abu Dhabi*, 215 F.3d 247, 251 (2d Cir. 2000); *see also*

9  *Mobil Cerro Negro*, 863 F.3d at 104 (explaining that Congress's intent was to

10  effectively codify the Tate Letter's restrictive approach to sovereign immunity).

11  There are exceptions for waiver, commercial activity, expropriations, succession,

12  personal injury in the United States, arbitration, maritime liens, state-sponsored

13  terrorism, and counterclaims. *See* 28 U.S.C. §§ 1605, 1605A, 1607. Together, these

14  exceptions form the "sole basis for obtaining jurisdiction over a foreign state in our

15  courts." *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989);

16  *Arch Trading*, 839 F.3d at 199 (explaining that "[a]bsent such an exception, the

17  immunity conferred by the FSIA strips courts of both subject matter and personal

18  jurisdiction over the foreign state").

18

1      Because of this statutory structure, courts must be careful when interpreting

2  the scope of the FSIA's exceptions to avoid upending the "careful balance" that

3  Congress intended to strike. *See Rubin*, 138 S. Ct. at 822. Too restrictive a reading,

4  and foreign sovereigns could avoid accountability even where Congress dictated

5  otherwise. *See id.* Too expansive, and the exceptions could result in a flood of suits

6  against foreign states, prompting those nations to reciprocate in foreign suits

7  against the United States. *See Philipp*, 141 S. Ct. at 714 (expecting reciprocal action

8  by foreign nations); *Helmerich & Payne*, 137 S. Ct. at 1322 (noting the State

9  Department's warning that weak sovereign immunity rules could "produc[e]

10  friction in our relations with [other] nations," which might "lead[] some to

11  reciprocate by granting their courts permission to embroil the United States in

12  expensive and difficult litigation" (internal quotation marks omitted)).

13      It is undisputed that the defendants in this case – a political subdivision of

14  the Swiss Confederation and two Swiss federal agencies – are all foreign

15  sovereigns under the FSIA. *See* 28 U.S.C. § 1603(a) (defining "foreign state" to

16  include "a political subdivision of a foreign state or an agency or instrumentality

1 of a foreign state").[8]  So, to hale them into court, the Art Owners must demonstrate

2 that this case falls within one of the FSIA's exceptions.  The Art Owners identify

3 only one exception as applicable:  the expropriation exception.

4          As its name suggests, the expropriation exception supplies federal courts

5 with jurisdiction over certain cases concerning property taken by a foreign

6 government:

7          A foreign state shall not be immune from the jurisdiction
8          of courts of the United States or of the States in any case
9          . . . in which rights in property taken in violation of
10         international law are in issue and that property or any
11         property exchanged for such property is present in the
12         United States in connection with a commercial activity
13         carried on in the United States by the foreign state; or that
14         property or any property exchanged for such property is
15         owned or operated by an agency or instrumentality of
16         the foreign state and that agency or instrumentality is
17         engaged in a commercial activity in the United States.

18 28 U.S.C. § 1605(a)(3).[9]

---

[8] There is some dispute about whether the Swiss Agencies are merely agencies or instrumentalities of the Swiss Confederation or are part of the foreign state itself.  Because this distinction does not affect our opinion, we do not resolve the issue.

[9] Notably, "no other country has adopted a comparable limitation on sovereign immunity." *Philipp*, 141 S. Ct. at 713.  The reason for our nonconformity is that "the United States has long sought to protect the property of its citizens abroad as part of a defense of America's free enterprise system."  *Id.*

1      A plaintiff seeking to invoke this exception must show four things:

2    "(1) [that] rights in property are in issue; (2) that the property was 'taken'; (3) that

3    the taking was in violation of international law; and (4) that one of the [provision's]

4    two nexus requirements is satisfied." *Rukoro*, 976 F.3d at 224 (quoting *Zappia*, 215

5    F.3d at 251); *see also* Restatement (Fourth) of Foreign Rels. L. of U.S. § 455 cmt. a

6    (Am. L. Inst. 2018).[10] Our decision today concerns the second and third elements

7    of the exception, which requires unpacking the meaning of the phrase "taken in

8    violation of international law."

9      We begin with the word "taken." In this context, a taking is "[c]onduct

10   attributable to a state that is intended to, and does, effectively deprive an alien of

11   substantially all the benefits of his interest in property." *Banco Nacional de Cuba v.*

12   *Chem. Bank N.Y. Tr. Co.*, 822 F.2d 230, 239 (2d Cir. 1987) (emphasis omitted)

13   (quoting Restatement (Second) § 192 (Am. L. Inst. 1965)); *cf. Philipp*, 141 S. Ct. at 715

---

[10] "The Restatement [of Foreign Relations Laws of the United States (the "Restatement")], a kind of treatise or commentary, is not a *primary* source of authority upon which, standing alone, courts may rely for propositions of customary international law. Such works at most provide evidence of the practice of States, and then only insofar as they rest on factual and accurate descriptions of the past practices of states, not on projections of future trends or the advocacy of the 'better rule.'" *United States v. Yousef*, 327 F.3d 56, 99 (2d Cir. 2003). Bearing this in mind, courts sometimes consult the Restatement when interpreting the FSIA and addressing international law. *See, e.g.*, *Helmerich & Payne*, 137 S. Ct. at 1320–21; *Permanent Mission of India*, 551 U.S. at 200; *Walters v. Indus. & Com. Bank of China, Ltd.*, 651 F.3d 280, 288, 295 (2d Cir. 2011); *but see Garb*, 440 F.3d at 596 n. 21.

1   (holding that the exception does not apply to a state's taking of its own citizen's

2   property).  This applies equally to deprivations that occur in one fell swoop and

3   to deprivations that occur in stages through the accumulation of small restrictions.

4   *See* Restatement (Third) § 712 cmt. g, n.7 (Am. L. Inst. 1987).

5       A significant exception to this general definition concerns a state's exercise

6   of its traditional regulatory or police powers over its internal affairs.  *See E. N.Y.*

7   *Sav. Bank v. Hahn*, 326 U.S. 230, 232 (1945) (explaining that "the police power[] is

8   an exercise of the sovereign right of the government to protect the general welfare

9   of the people" (internal quotation marks and alterations omitted)); *see also*

10  Restatement (Third) § 712 cmt. g (noting that "[a] state is [ordinarily] not

11  responsible for loss of property or for other economic disadvantage resulting from

12  bona fide general taxation, regulation, forfeiture for crime, or other action of the

13  kind that is commonly accepted as within the police power of states"); Restatement

14  (Second) § 197 ("Conduct attributable to a state and causing damage to an alien

15  does not depart from the international standard of justice . . . if it is reasonably

16  necessary for . . . the enforcement of any law of the state . . . that does not itself

17  depart from the international standard").  Such actions typically do not constitute

22

1    a taking, even if they result in the loss of property or other economic harm.[11]  *See,*

2    *e.g.*, *West v. Multibanco Comermex, S.A.*, 807 F.2d 832, 831–32 (9th Cir. 1987) (holding

3    that a state's institution of monetary exchange controls did not constitute a taking

4    because it was within the country's "basic authority to regulate its economic

5    affairs"); Restatement (Third) § 712 cmt. g, n.6.  A state, however, may not effect

6    an illegal taking in the guise of an exercise of its police powers.  For that reason,

7    when a state has "effectively deprive[d] an alien of substantially all the benefits of

8    his interest in property," *Banco Nacional*, 822 F.2d at 239, through an ostensible

9    exercise of its police powers, whether a taking has occurred will turn on whether

10   that taking was "in violation of international law."  *Rukoro*, 976 F.3d at 224.

11        The expropriation exception is concerned only with illegal takings.  And the

12   legal standards by which takings are judged are not found in the domestic laws of

13   the United States or even the laws of the "expropriating" nation, but rather in

14   customary international law.  *See Permanent Mission of India*, 551 U.S. at 200; *Chettri*,

---

[11] In many ways, this mirrors our domestic law on takings.  *See Bennis v. Michigan*, 516 U.S. 442, 452 (1996) (holding that "[t]he government may not be required to compensate an owner for property which [the government] has . . . lawfully acquired under the exercise of governmental authority other than the power of eminent domain"); *United States v. Davis*, 648 F.3d 84, 97 (2d Cir. 2011) (explaining that "it has long been settled that if the government acts pursuant to a forfeiture statute, it may seize personal property without compensating the owner" (internal quotation marks omitted)).

1    834 F.3d at 58; *see also Flores v. S. Peru Copper Corp.*, 414 F.3d 233, 250–52 (2d Cir.

2    2003) (discussing various sources that may be used to identify principles of

3    customary international law).  Put more colorfully, "United States law governs

4    domestically but does not rule the world."  *Philipp*, 141 S. Ct. at 713 (quoting *Kiobel*

5    *v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 115 (2013)).

6         To determine which takings offend these international standards, we have

7    historically turned, in part, to House Report 94-1487 on the FSIA legislation.  *See*

8    *Chettri*, 834 F.3d at 58; *Zappia*, 215 F.3d at 251.  The House Report identifies three

9    categories of illegal takings:  (i) "nationalization[s] or expropriation[s] of property

10   without payment of . . . prompt[,] adequate[,] and effective compensation";

11   (ii) takings that are "discriminatory"; and (iii) takings that are "arbitrary."[12]  *See*

12   H.R. Rep. No. 94-1487, at 19–20 (1976), *as reprinted in* 1976 U.S.C.C.A.N. 6604, 6618;

---

[12] We have previously framed the latter two categories as subsets of the first, *see Zappia*, 215 F.3d at 251, but it is more accurate to treat each of the three as conceptually distinct, *see* H.R. Rep. No. 94-1487, at 19–20 (1976), *as reprinted in* 1976 U.S.C.C.A.N. 6604, 6618 (stating that each of these categories is "include[d]" in the phrase "taken in violation of international law" (internal quotation marks omitted)); *see also* Restatement (Third) § 712(1) (identifying three categories of takings that violate international law).  This is a minor clarification, though, and does not change our analysis here.

24

1    *see also Chettri*, 834 F.3d at 58.  In this appeal, the plaintiffs focus their arguments

2    on the third category, claiming that the seizure of their artwork was arbitrary.[13]

3         Today, we hold that an "arbitrary taking" is a taking that bears no rational

4    relationship to a public purpose.  We settle on this definition for two reasons.  First,

5    the lack of a public purpose has been identified by both courts and the Restatement

6    as a paradigmatic example of a taking that violates international law.  *See, e.g.,*

7    *Comparelli v. República Bolivariana de Venezuela*, 891 F.3d 1311, 1326 (11th Cir. 2018);

8    *Cassirer v. Kingdom of Spain*, 616 F.3d 1019, 1027 (9th Cir. 2010) (*en banc*); *Chettri v.*

9    *Nepal Bangladesh Bank, Ltd.*, No. 10-cv-8470 (PGG), 2014 WL 4354668, at *16

10   (S.D.N.Y. Sept. 2, 2014), *aff'd*, 834 F.3d 50 (2d Cir. 2016); *Smith Rocke Ltd. v. República*

11   *Bolivariana de Venezuela*, No. 12-cv-7316 (LGS), 2014 WL 288705, at *7 (S.D.N.Y. Jan.

12   27, 2014); Restatement (Third) § 712(1)(a) & cmt. e; Restatement (Second) § 185(a).

13   Second, this definition dovetails with the restrictive approach to sovereign

14   immunity announced in the Tate Letter and largely codified in the FSIA, *see*

15   *Philipp*, 141 S. Ct. at 713; *Garb*, 440 F.3d at 585–86, which "recognize[s] immunity

16   in cases based on a foreign state's public acts, but not in cases based on commercial

17   or private acts," H.R. No. 94-1487, at 8, *as reprinted in* 1976 U.S.C.C.A.N. at 6607.

---

[13] The plaintiffs do not argue that Switzerland or Geneva has nationalized or expropriated their artwork or that the seizures were the result of discrimination.

1    The Art Owners propose a much broader interpretation of the term.

2    Drawing on a definition of "arbitrary" found in the Restatement (Third), they

3    suggest that an "arbitrary taking" refers to any taking that is merely "unfair and

4    unreasonable[]."  Beierwaltes Reply at 4 (internal quotation marks omitted).  But

5    that definition is not only unsupported by caselaw, it is also taken out of context.

6    Specifically, "unfair and unreasonable" is how the Restatement describes actions

7    by a foreign sovereign that fall under Subsection (3) of § 712, *i.e.*, those that,

8    although causing economic injury to an alien, "fall[] short of an act that would

9    constitute an expropriation under Comment g."  Restatement (Third) § 712 n.11.

10   Comment g, in turn, describes subsection (1) of § 712, covering "a *taking* by the

11   state of the property of a national of another state[.]"  *Id.* § 712(1) (emphasis

12   added).  And because the FSIA speaks only of "rights in property *taken* in violation

13   of international law," 28 U.S.C. § 1605(a)(3) (emphasis added), rather than "other

14   arbitrary or discriminatory acts or omissions by the state that impair property or

15   other economic interests," Restatement (Third) § 712 (3), that definition has no

16   place here.

17       Instead, we conclude that a foreign state's action is an arbitrary "taking in

18   violation of international law" if the foreign state exceeds its traditional police

26

1   powers to deprive an alien of substantially all the benefit of her property in a way

2   that is not rationally related to a public purpose.

3   **B.    The Swiss Investigatory Seizure**

4          At the heart of the parties' dispute is the question of whether a temporary

5   seizure made as part of an ongoing law enforcement investigation can constitute

6   a taking in violation of international law.  The answer is "yes," but only in rare

7   circumstances.  Such circumstances are not present here.

8          **1.    When Does a Temporary Law Enforcement Seizure Constitute a
9                   Taking in Violation of International Law?**

10         Temporary law enforcement seizures ordinarily do not constitute a taking

11  at all, much less a taking in violation of international law.[14]  *See Chettri*, 834 F.3d

12  at 58 (rejecting "the proposition that" a foreign state's decision to "fr[ee]ze . . .

13  financial assets in connection with . . . a routine law enforcement action . . .

14  constitutes a taking within the meaning of [the FSIA]"); *see also Off. Stanford Invs.*

15  *Comm. v. Bank of Antigua*, No. 13-cv-762 (DCG), 2018 WL 3956470, at *4 (N.D. Tex.

16  Aug. 17, 2018); *Hilsenrath v. Swiss Confederation*, No. C 07-02782 (WHA), 2007 WL

17  3119833, at *4 (N.D. Cal. Oct. 23, 2007), *aff'd*, 402 F. App'x 314 (9th Cir. 2010);

---

[14] Again, this resembles domestic law on takings.  *See Davis*, 648 F.3d at 97; *see also AmeriSource Corp. v. United States*, 525 F.3d 1149, 1154 (Fed. Cir. 2008); *Acadia Tech.*, 458 F.3d at 1331–32; *United States v. $7,990.00 in U.S. Currency*, 170 F.3d 843, 845–46 (8th Cir. 1999).

1    *Greenpeace, Inc. (U.S.A.) v. State of France*, 946 F. Supp. 773, 782–84 (C.D. Cal. 1996);

2    Restatement (Third) § 712 cmt. g; Restatement (Second) §§ 192 n.2, 197.  This is

3    because such seizures usually fall within the scope of a state's traditional police

4    powers.  *See* Restatement (Third) § 712 cmt. g; *cf. Warden, Md. Penitentiary v.*

5    *Hayden*, 387 U.S. 294, 302 (1967) (discussing police powers in the domestic context).

6    But, of course, a foreign state cannot absolve itself of liability for an otherwise

7    illegal taking simply by branding the action as a law enforcement seizure.

8    Accordingly, there are a handful of circumstances in which this general rule does

9    not apply.  Three of those circumstances are relevant here.

10          First, a law enforcement seizure may constitute an illegal taking if the

11   seizure is not rationally related to a public purpose.  *See West*, 807 F.2d at 831

12   (recognizing that "[v]alid expropriations must *always* serve a public purpose"

13   (emphasis added)); *Chettri*, 2014 WL 4354668, at *16 (similar); *see also* Restatement

14   (Third) § 712(1)(a).  In other words, if a law enforcement seizure is "arbitrary," as

15   we explained that term above, then it both falls outside the scope of the state's

16   traditional police powers because it serves no valid governmental objective and

17   violates international law.

28

1       Determining whether a particular seizure constitutes an arbitrary taking for

2    purposes of the FSIA is not the same as asking whether the seizure is unlawful

3    under the "seizing" nation's applicable criminal laws. *See Chettri*, 834 F.3d at 58

4    (holding that "conclusory criticisms of the manner in which [the foreign state] has

5    conducted its investigation are insufficient to prove a violation of international

6    law"). Rather, it requires first asking whether the law enforcement investigation

7    itself is rationally related to a public purpose.[15] If so, then as long as the seizure

8    bears a rational connection to that investigation, the seizure is not arbitrary. *See*

9    *Chettri*, 834 F.3d at 58; *West*, 807 F.2d at 831; *Greenpeace*, 946 F. Supp. at 783.

10       Second, even if a seizure bears some facial connection to a public purpose,

11   it may nonetheless constitute an illegal taking if that public purpose is shown to

12   be a "sham" – that is, if the seizure is merely a ploy by the foreign state either to

13   nationalize the plaintiff's property without compensation or to discriminate

14   against her because she is an alien. *Siderman de Blake v. Republic of Argentina*, 965

15   F.2d 699, 704 (9th Cir. 1992); *see* Restatement (Third) § 712 cmt. g. While pretextual

16   seizures will likely be few and far between, such seizures will often be

---

[15] Investigations into suspected criminal conduct will generally satisfy this requirement, as protecting the public from harm is unquestionably a public purpose. *See Chettri*, 834 F.3d at 58; *Hilsenrath*, 2007 WL 3119833, at *4 (holding that "[i]t is frivolous to claim that freezing assets during a legitimate criminal investigation violated criminal law").

1    recognizable from an examination of the investigation's course, or because the

2    foreign officials have acted in such a way or made statements that strongly suggest

3    that there is an ulterior motive at work.  *See, e.g.*, *Comparelli*, 891 F.3d at 1317, 1327–

4    28 (remanding for district judge to consider whether expropriation exception was

5    satisfied where government seized plaintiffs' chemical company on grounds it

6    illegally stored three million unreported pounds of hydrochloric acid, but physical

7    audit revealed only excesses "within the normal tolerance margins associated with

8    the weighing of bulk purchases"); *see also Siderman*, 965 F.2d at 704 (finding

9    expropriation exception satisfied under pre-*Helmerich & Payne* standard where

10   government first "imprisoned and killed the accountant to whom [Sidermans] had

11   granted management powers" and then held *ex parte* receivership proceeding on

12   grounds company "lacked a representative").

13        Third, a temporary law enforcement seizure that is not initially a taking can

14   nonetheless ripen into an arbitrary one if it continues for an unreasonably long

15   and indefinite period.[16]  *See Sardino v. Fed. Rsrv. Bank of N.Y.*, 361 F.2d 106, 111 (2d

16   Cir. 1966) (acknowledging that it is "hard to say there is no deprivation when a

---

[16] It goes without saying that this does not apply to seizures that become permanent because of a bona fide criminal conviction.  *See* Restatement (Third) § 712 cmt. g (indicating that a "forfeiture for crime" does not constitute a taking even though it results in the permanent "loss of property").

1    man is prevented both from obtaining his property and from realizing any benefit

2    from it for a period of indefinite duration which may outrun his life"); *see also*

3    Restatement (Third) § 712 cmt. g, n.6 (explaining that a temporary seizure "might

4    become a taking if it is long extended"); Restatement (Second) § 192 n.2. Of course,

5    there is no catchall answer to the question of how long is too long; each

6    investigation is unique and must be considered in context.  But there are a few

7    factors that courts might consider in addition to the duration of the seizure to help

8    guide this assessment, including:    (i) whether the investigation has been

9    prosecuted diligently since the seizure occurred; (ii) the complexity and scope of

10   the investigation; (iii) whether formal criminal charges have been filed that bear

11   some connection to the seized property; and (iv) whether the plaintiff has

12   cooperated with the investigation or taken any other steps, judicial or otherwise,

13   to move the investigative process along.[17]  *See, e.g.*, *Chettri*, 2014 WL 4354668, at

14   *18; *Greenpeace*, 946 F. Supp. at 783.

15         The Art Owners identify a fourth circumstance in which they argue a law

---

[17] This last factor is not intended to impose an exhaustion requirement on plaintiffs.  Rather, it is an acknowledgment that, all else being equal, a seizure's duration will look very different depending on whether the plaintiff has taken advantage of the tools at her disposal to help speed up the investigation.  Simply put, a plaintiff who refuses to utilize those lawful tools should reasonably expect that the investigation will take longer as a result.

enforcement seizure would come within the boundaries of the expropriation exception: if the seizure is made without probable cause in contravention of either the "seizing" nation's law (here, Switzerland) or the Fourth Amendment. But, in making this argument, the Art Owners identify no precedent suggesting that international law has adopted those probable cause standards, let alone that an investigatory seizure in violation of those standards would automatically constitute an illegal taking. And while that alone is fatal to the Art Owners' position, it is also noteworthy that the Fourth Amendment itself has only limited extraterritorial application. *See United States v. Getto*, 729 F.3d 221, 227–28 (2d Cir. 2013) (holding that the Fourth Amendment generally does not require "suppressing evidence collected by foreign law enforcement authorities abroad"); *see also United States v. Hasbajrami*, 945 F.3d 641, 662–63 (2d Cir. 2019); *United States v. Odeh* (*In re Terrorist Bombings of U.S. Embassies in E. Africa*), 552 F.3d 157, 167–71 (2d Cir. 2008). We therefore reject the Art Owners' invitation to conclude that a foreign law enforcement seizure that fails to meet the probable cause standards found in Swiss or United States law *ipso facto* constitutes a taking in violation of international law.

1    Before applying these principles to the law enforcement seizure at issue

2    here, we pause for a note of caution. Specifically, courts must be deferential when

3    assessing a foreign sovereign's police activities. One of the FSIA's purposes is to

4    avoid stoking international tensions, *see Philipp*, 141 S. Ct. at 714; *Zappia*, 215 F.3d

5    at 251, and meddling in a foreign nation's ongoing criminal investigations will

6    often be invasive of its sovereignty. As a result, we expect that law enforcement

7    seizures will be declared to be illegal in only rare and egregious circumstances.

8    *See Chettri*, 834 F.3d at 58; Restatement (Second) § 185 cmt. b (noting that "[t]here

9    appear to be few, if any, cases in which a taking has been held unlawful under

10   international law on the sole and specific ground that it was not for a public

11   purpose").

12   **2.    The Swiss Law Enforcement Seizure Is Not a Taking in Violation**
13   **of International Law**

14   The investigation in this case bears a rational relationship to a public

15   purpose. Swiss law enforcement officers observed Phoenix employees and

16   Hicham's sister-in-law engaging in what appeared to be criminal violations of

17   customs laws and the unlawful importation of art. Curtailing criminal activity is

18   in the public interest, and stopping the illegal importation of cultural property is

19   important to Switzerland's efforts to comply with its obligations under the

33

1    UNESCO Convention.

2         The Art Owners' property also has a rational connection to this

3    investigation, as it was stored in warehouses owned and operated by individuals

4    whom Swiss authorities suspected of illegally importing and possessing cultural

5    property.  This remains true regardless of whether the seized art was actually

6    owned by one of the named defendants in the Swiss investigation or was owned

7    by a third party (like the Art Owners).  *See Off. Stanford Invs. Comm.*, 2018 WL

8    3956470, at *1, *4 (finding that a seizure of assets involved in a Ponzi scheme was

9    not a taking even though those assets were scheduled to be distributed to the

10   fraud's victims); *cf. Bennis*, 516 U.S. at 453 (explaining that, in the context of

11   domestic law, the inquiry focuses on the character of the government action, not

12   the culpability or innocence of the property owner).  In either case, the property

13   bore some rational connection to the investigation.  Accordingly, the seizure of the

14   Art Owners' property was rationally connected to a public purpose and, as a

15   result, was not arbitrary.

16        While that conclusion could have been overcome had the Art Owners

17   identified facts strongly suggesting that the investigation and seizure were merely

18   a pretext to allow Switzerland to nationalize their property without compensation

34

1     or to discriminate against them because of their foreign citizenship, the district

2     court did not clearly err in finding that they had not done so.  To start, the

3     investigation's course does not indicate pretext.  The Art Owners' property was

4     seized pursuant to two warrants, which were obtained only after a routine

5     customs search and follow-on surveillance operations revealed possible criminal

6     activity.  And rather than comingle the Art Owners' artifacts with state property,

7     the investigators were careful to "segregate[] [the art] in place" and have merely

8     restricted the Art Owners' ability to "exercis[e] [their] ownership rights."

9     Aboutaam Br. at 10 n.9; Beierwaltes Br. at 11 n.9 (same).  Thus, there is no

10     suggestion that the Swiss Agencies or Geneva are claiming a legal interest in the

11     seized property or are manufacturing after-the-fact explanations for an illegal

12     expropriation.

13          Moreover, in the years since the property was seized, the investigators have

14     continued to collect and review evidence.  The investigators have also repeatedly

15     attempted to work cooperatively with the Art Owners.  Those facts are consistent

16     with a *bone fide* law enforcement investigation.  *See Greenpeace*, 946 F. Supp. at 783.

17     Thus, the district court's finding that "neither the timing of the items' release nor

18     the level of specificity of the warrants furnishes an appropriate basis to scrutinize

35

1   . . . [the] ongoing criminal investigation" was not clearly erroneous. *Aboutaam*,

2   2019 WL 4640083, at *4.

3       Likewise, the Art Owners have identified no other facts that would seriously

4   call into question the purpose of the investigation – at least, not in any way

5   relevant to the expropriation exception.  The Art Owners make various threadbare

6   assertions about the lead Geneva prosecutor, Claudio Mascotto, and his team,

7   suggesting that the investigation is merely a publicity stunt and a vindictive

8   attempt to harm Ali and Phoenix.[18]  For instance, the Art Owners make vague

9   references to Mascotto's "reputation as an aggressive, publicity-seeking

10  prosecutor," Beierwaltes Br. at 19, to one of the investigation's experts behaving in

11  an "unprofessional" manner, *id.* at 22, and to the possibility that this investigation

12  is being used to coerce Phoenix to withdraw a legal challenge to a separate CPTA

13  proceeding.  But, in each case, the Art Owners' assertions are entirely conclusory.

14  And, in any event, while this behavior (if true) might constitute a breach of Swiss

15  law, the Art Owners have not identified what *international* laws it would violate.

16  Consequently, there is no basis on which to conclude that this seizure is in fact an

17  illegal taking in disguise.

---

[18] Mascotto resigned from his position in December 2019 to run for public office.  The investigation is currently led by his successor.

36

1       Finally, the Art Owners argue that the seizure violated international law

2  because it was prohibited by the UNESCO Convention.  In short, the Art Owners

3  suggest that, under Article 7(b)(ii) of the Convention, illegally imported cultural

4  property cannot be seized absent a request by the property's nation of origin.[19]

5  This treaty provision offers a remedy for nations whose cultural property was

6  illegally exported but, contrary to the Art Owners' claim, does not purport to serve

7  as the exclusive means for states to combat art trafficking.  Thus, while a seizure

8  in express violation of an international treaty could potentially constitute a breach

9  of international law, *see Flores*, 414 F.3d at 256; Restatement (Second) § 165(1)(b),

10  we agree with the district court that no such violation occurred here because,

11  among other reasons, the Art Owners identify no provision in the Convention that

12  would prohibit Switzerland from seizing stolen or trafficked goods inside its own

13  borders, even if such a seizure is not mandated by the Convention.  *See Aboutaam*,

14  2019 WL 4640083, at *5.

15       Because the seizure was not a taking in violation of international law when

---

[19] Article 7(b)(ii) merely requires the State Parties to the Convention to "undertake . . . at the request of the State Party of origin, to take appropriate steps to recover and return any [illegally exported] cultural property imported after the entry into force of this Convention" and requires "[t]he requesting Party [to] furnish, at its expense, the documentation and other evidence necessary to establish its claim for recovery and return."  823 U.N.T.S. at 241.

1    it occurred, the only way it might come within the expropriation exception is if it

2    had become a taking over time.  We conclude that it has not.

3        As of now, the seizure has been ongoing for a little more than four years

4    (and, importantly, the Art Owners sued after only one and a half years).  This

5    duration is not out of step with what one would expect in an investigation

6    involving thousands of pieces of art and antiquities, nor is it significantly longer

7    than the duration of seizures that courts have previously found not to constitute a

8    taking.  *See, e.g.*, *Chettri*, 834 F.3d at 54, 58 (two and a half years before criminal

9    charges were filed); *Acadia Tech.*, 458 F.3d at 1329 (four years before forfeiture

10    complaint was filed in domestic investigation).  In fact, the Art Owners' counsel

11    conceded below that the seizure "isn't indefinite yet."  Aboutaam App'x at 613.

12    And while criminal charges have not yet been filed, the investigation has

13    progressed since the initial seizure.

14        Also relevant here is the fact that the Art Owners have thus far refused to

15    cooperate with the investigation and have not otherwise taken advantage of

16    domestic Swiss remedies that could potentially speed things along.  Having

17    chosen not to avail themselves of those opportunities, the Art Owners should

18    reasonably have expected that the investigation would take longer.  To be sure,

1    the Art Owners did send a handful of letters to Swiss officials identifying which

2    pieces of art they claim legally belong to them.  The record, however, contains no

3    evidence that the Art Owners provided documentation that could corroborate

4    their claims.  Accordingly, those officials were under no obligation to "take [the

5    Art Owners] at their word[.]"  Geneva Br. at 34.

6        At bottom, nothing about this investigation indicates that it is an arbitrary

7    act or a pretextual attempt to nationalize the Art Owners' property.  Nor do the

8    facts compel the conclusion that the seizure has extended for an unreasonable

9    amount of time.  All the Art Owners offer are "conclusory criticisms of the manner

10   in which [Geneva and the Swiss Agencies] ha[ve] conducted [their] investigation."

11   *Chettri*, 834 F.3d at 58.  But, as our precedent makes clear, such criticisms "are

12   insufficient to prove" that a law enforcement seizure qualifies as a taking in

13   "violation of international law."  *Id.*

14                              *      *      *

15       Before moving on, we offer a few additional words about the Art Owners'

16   decision to sue in the United States before seeking recourse in Swiss court.  *See*

17   *Aboutaam*, 2019 WL 4640083, at *5.  Whether the expropriation exception

18   incorporates an exhaustion requirement is the source of some dispute among our

39

1    sister circuits. *Compare Federal Republic of Germany v. Philipp*, 894 F.3d 406, 414–16

2    (D.C. Cir. 2018) (rejecting an exhaustion requirement), *vacated on other grounds*, 141

3    S. Ct. 703 (2021), *with Fischer v. Magyar Allamvasutak Zrt.*, 777 F.3d 847, 854, 856–59

4    (7th Cir. 2015) (declaring exhaustion to be required under international law), *and*

5    *Abelesz v. Magyar Nemzeti Bank*, 692 F.3d 661, 678–85 (7th Cir. 2012) (same); *see also*

6    *Republic of Austria v. Altmann*, 541 U.S. 677, 714 (2004) (Breyer, *J.*, concurring)

7    (explaining that "a plaintiff who chooses to litigate in this country in disregard of

8    the postdeprivation remedies [available] in the 'expropriating' state may have

9    trouble showing a 'taking in violation of international law'" (brackets omitted));

10   *Cassirer*, 616 F.3d at 1034–37 (concluding that the FSIA does not *mandate*

11   exhaustion, but leaving open whether courts may consider exhaustion as a

12   prudential factor before accepting jurisdiction over a case against a foreign

13   sovereign). Because we can resolve this case on other grounds, we do not analyze

14   this issue. That said, the Art Owners' suggestion that exhaustion would have been

15   futile here simply because the Swiss government is on the other side of the "v."

16   borders on the frivolous. Absent a strong showing to the contrary, we have no

17   reason to question the Swiss judiciary's ability to fairly and impartially review the

18   lawfulness of its government's actions.

1 **C.      Jurisdictional Discovery**

2          Because the purpose of sovereign immunity is to protect foreign nations not

3   only from liability but also from "the expense, intrusiveness, and hassle of

4   litigation, a court must be circumspect in allowing discovery before the plaintiff

5   has established that the court has jurisdiction over a foreign sovereign defendant

6   under the FSIA." *Arch Trading*, 839 F.3d at 206 (internal quotation marks omitted).

7   In practice, this means that a plaintiff should be granted jurisdictional discovery

8   "only to verify allegations of specific facts crucial to an immunity determination."

9   *Id.* at 207 (internal quotation marks omitted).  A court therefore does not abuse its

10  discretion in denying jurisdictional discovery "if the party seeking discovery

11  cannot articulate a reasonable basis for the court first to assume jurisdiction." *Id.*

12  at 206–07 (internal quotation marks omitted).

13         Here, the Art Owners have identified no specific discovery that could

14  credibly support their claim that this law enforcement seizure constitutes a taking

15  in violation of international law.  In light of that fact, and given the significant

16  comity concerns at stake, the district court plainly did not abuse its discretion by

17  denying the Art Owners the opportunity to conduct jurisdictional discovery.  *See*

18  *NML Cap.*, 573 U.S at 146 n.6 (acknowledging that district courts may

1    "appropriately consider comity interests and the burden that the discovery might

2    cause to the foreign state" (internal quotation marks omitted)).

3    **IV.   Conclusion**

4    For the foregoing reasons, we **AFFIRM** the judgment of the district court.